The STATE of Ohio, Appellee,

v.

RAMOS, Appellant.

[Cite as State v. Ramos, 155 Ohio App.3d 396, 2003-Ohio-6535.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 2002 CA 111.

Decided Nov. 26, 2003.

Stephen C. Collins, Clark County Assistant Prosecuting Attorney, for appellee.

L. Patrick Mulligan, for appellant.

WOLFF, Judge.

{¶ 1} Loretta A. Ramos pled no contest to aggravated possession of drugs after the Clark County Court of Common Pleas overruled her motion to suppress. The court found her guilty and sentenced her to six years of imprisonment, to be served concurrently with another sentence issued in Montgomery County, as well as to a five-year driver's license suspension. On appeal, Ramos asserts one assignment of error:

{¶ 2} "The trial court erred in failing to sustain the motion to suppress, because the officers in this case did not have a sufficient cause to prolong this 'traffic' stop for as long as they did."

{¶ 3} At approximately 5:45 a.m. on November 19, 2001, Ohio State Trooper Sgt. Joe Luebers stopped a white sport utility vehicle ("SUV") driven by Ramos for a marked-lanes violation. The trooper had previously been alerted by an

anonymous call that a vehicle matching Ramos's SUV was weaving within its lane. Ramos told Sgt. Luebers that she had swerved because an ash had gotten in her eye. Ramos was traveling with two passengers: a woman in the front passenger seat and a man lying in the back seat. Ramos explained that she had driven to New York to pick up her sister-in-law, Maria C. Soto (the front seat passenger), who had been at a battered women's shelter, and that she was taking her back to Dayton. Ramos later identified the male passenger, Ryan Johnson, as her son-in-law, who, she explained, had driven with her for protection. Sgt. Luebers ran a check on Ramos's and Soto's identifications. According to the videotape of the traffic stop, at 5:53 a.m., the trooper learned that Ramos's driver's license had expired. Ramos later indicated that neither Soto nor Johnson had valid driver's licenses either. At 5:58 a.m., the dispatcher informed Sgt. Luebers that Ramos had had a drug trafficking charge in September 2001.

{¶ 4} At approximately 5:57 a.m., Sgt. Luebers requested a canine unit. At the hearing on Ramos's motion to suppress, Sgt. Luebers testified that he summoned the K–9 unit, because "[t]here was something that was not right about that stop." He indicated that Ramos's explanation of her trip to New York made him suspicious. He noted that there was no luggage in the car and that the front seat passenger was very nervous. Sgt. Luebers testified that he also considered the back seat passenger's behavior to be another indicator of criminal activity. Specifically, he pointed to Johnson's being curled up in a fetal position and his lack of movement during the traffic stop. The trooper further testified that there was an "immense odor of air fresheners." According to the videotape of the stop, at 6:31 a.m., Sgt. Luebers commented that there was cinnamon-scented "air freshener galore."

{¶ 5} At approximately, 6:00 a.m., State Trooper Meyers arrived. Sgt. Luebers asked Ramos to return to his vehicle with him while the two passengers remained in the SUV. Sgt. Luebers testified that he began to write the citation for Ramos at 6:06 a.m. He indicated that the ticket, which would address the marked-lanes violation, the expired license, and a seatbelt violation, would typically take him 25 to 30 minutes to write. For approximately the next 17 minutes, Sgt. Luebers questioned Ramos about the nature of her trip, the passengers, and her personal history. At 6:38 a.m., State Trooper Darren Fussner arrived with the drug-sniffing dog. After the passengers were removed from the vehicle, Trooper Fussner walked the dog around the SUV. At 6:42 a.m., the dog alerted near the right rear tire of the vehicle. After the alert, the troopers began to search the interior of the vehicle. Johnson admitted to having a small amount of marijuana, which he gave to the trooper. At approximately 6:58 a.m., Sgt. Luebers discovered Ecstacy pills inside the pocket of a pair of sweat pants that were hanging in the back of the vehicle. Ramos was arrested

and taken to the police station, where she was questioned further. Ramos ultimately was charged with aggravated possession of drugs.

{¶ 6} Ramos filed a motion to suppress, seeking to exclude the drugs and her statements to the state troopers. After reviewing the tape of the traffic stop and of the subsequent search of Ramos's vehicle and hearing the testimony of Sgt. Luebers and Trooper Fussner, the trial court overruled Ramos's motion to suppress in its entirety. It ruled that the police properly stopped Ramos for a marked-lanes violation. The court further concluded that the search and the subsequent seizure were legal based on the alert by the dog and that the trooper "had reason, as he testified, to call for that dog." In particular, the trial court noted the "nature of the defendant driving from Dayton to New York and back again in a round-trip and the circumstances under which [s]he picked up a passenger in the Bronx according to her statement," the male sleeping in the rear, and the alert by the drug-trained dog. The trial court further ruled that her statements were admissible.

{¶ 7} On appeal, Ramos contends that the troopers prolonged the traffic stop longer than was necessary to issue the tickets. She asserts that the trooper needed to have a reasonable suspicion of some drug offense before he called for the canine at 5:57 a.m. and that the police trooper did not have a reasonable suspicion of drug activity. Ramos also argues that the trooper's actions were unreasonable. She argues that checking the passengers for warrants is highly suspect. In addition, she claims that a passenger's possession of a small amount of marijuana should not suggest that she, the driver, was also involved in drug activity. The state responds that the drug-sniffing canine was on the scene within the time typically required to write the type of citation that Ramos received, plus the additional time that is necessary to get the vehicle off the road. The state further argues that Sgt. Luebers had a reasonable articulable suspicion that the SUV contained narcotics, thus permitting him to delay Ramos for the short time necessary for the drug-sniffing dog to arrive.

{¶ 8} As an initial matter, Ramos's assertion that the trooper needed to have a reasonable suspicion of some drug offense before he summoned a drug-sniffing dog is clearly wrong. It is well-established that a canine sniff does not constitute a search under the Fourth Amendment. *United States v. Place* (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110. Accordingly, a police officer need not have a reasonable suspicion that a vehicle contains contraband prior to summoning a canine drug unit.

{¶ 9} The crux of this matter is whether Ramos was unreasonably detained between 5:45 a.m., when she was stopped, and 6:42 a.m., when the drug-sniffing dog alerted to narcotics in her vehicle, thus rendering the search of her vehicle unconstitutional. We note that Ramos has not challenged the validity of the

original stop of her vehicle for a marked-lanes violation, nor has she argued that statements she made to the troopers should have been suppressed.

{¶ 10} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. A traffic stop by a law enforcement officer must comply with the Fourth Amendment's reasonableness requirement. *Whren v. United States* (1996), 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89. The duration of a traffic stop may last no longer than is necessary to resolve the issue that led to the original stop, absent some specific and articulable facts that further detention was reasonable. *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237; see *State v. Kerns* (Mar. 16, 2001), Montgomery App. No. 18439, 2001 WL 257837.

{¶ 11} "When a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates. * * * 'In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.'" *State v. Aguirre,* Gallia App. No. 03CA5, 2003-Ohio-4909, 2003 WL 22136234, at ¶ 36, quoting *State v. Carlson* (1995), 102 Ohio App.3d 585, 598–599, 657 N.E.2d 591.

{¶ 12} In *State v. Loffer,* Montgomery App. No. 19594, 2003-Ohio-4980, 2003 WL 22149647, we held that when the search of a vehicle occurs during a reasonable period of time for processing a traffic citation, i.e., during a period of lawful detention, a police officer need not have a reasonable articulable suspicion of criminal behavior other than the traffic infraction.

{¶ 13} However, after the reasonable period of time for issuing the traffic citation has passed, an officer must have a reasonable articulable suspicion of illegal activity to continue the detention. The Supreme Court of Ohio has explained: "When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure." *State v. Robinette* (1997), 80 Ohio St.3d 234, 685 N.E.2d 762, paragraph one of the syllabus. When a canine drug search is involved, the police must have a reasonable suspicion that a vehicle contains drugs in order to detain a suspect further while a drug-sniffing canine is

brought to the scene. *State v. Heard,* Montgomery App. No. 19323, 2003-Ohio-1047, 2003 WL 860692; see *Kerns,* supra. "Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones* (1990), 70 Ohio App.3d 554, 556–557, 591 N.E.2d 810, citing *Terry,* 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Heard,* supra, quoting *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271.

{¶ 14} The state argues that the drug-sniffing dog arrived within the time typically required for Sgt. Luebers to write the citation for Ramos and to get her vehicle off the road. It states that at 6:06 a.m., dispatch advised Sgt. Luebers that Ramos did not have a valid driver's license. Sgt. Luebers testified that it typically takes 25 to 30 minutes to write the citation for these types of violations. The state thus argues that it would have been 6:31 to 6:36 a.m. before Sgt. Luebers completed the citation. It further notes that because neither Ramos nor her passengers had a valid driver's license, none of them would have been permitted to drive the vehicle away following the issuance of the citation. Consequently, Ramos would have been taken to a safe location to either call for a tow truck or a validly licensed driver to pick her up. Thus, an additional period of time would have passed prior to the vehicle's leaving the scene.

{¶ 15} Upon review of the videotape of the traffic stop, we note that Sgt. Luebers was advised at 5:53 a.m. that Ramos's driver's license had expired, i.e., 13 minutes earlier than the state contends that Sgt. Luebers learned that Ramos had an expired license. According to the videotape of the stop, at 6:02 a.m., after Ramos was seated in the trooper's vehicle, Sgt. Luebers informed her that her license had expired and asked her if any of her passengers had a valid license. Sgt. Luebers testified that he began to write the ticket at 6:06 a.m., 13 minutes after he first learned that Ramos's driver's license had expired. Thus, even crediting Sgt. Luebers's testimony that it typically would have taken him 25 to 30 minutes to process the citation, he should have completed the citation by 6:23 a.m., 15 minutes prior to the arrival of the canine unit.

{¶ 16} The state emphasizes that after the citation was issued, Ramos would not have been free to go, because her driver's license had expired. Sgt. Luebers testified that the vehicle could be left on the berm for up to 48 hours and Ramos could have asked a licensed driver pick it up, or, alternatively, Ramos could have had her vehicle towed. Regardless of which option was chosen, Sgt. Luebers typically would have taken the driver and passengers to a safe location to make

the necessary telephone calls. He indicated that he would have taken these steps after the traffic citations were written. Based on this testimony, the state argues that an unspecified amount of time would have been necessary to address the disposition of Ramos's vehicle and to get her a ride, and that the canine sniff occurred within this period of time. The state has the burden of proof on this issue and, in our judgment, the record fails to demonstrate that the troopers continued to be engaged in traffic-stop-related activities up to the time that the drug-sniffing canine gave them probable cause to search Ramos's vehicle for narcotics, or that the canine sniff would have occurred even if Sgt. Luebers had diligently pursued the traffic-stop-related activities.

{¶ 17} The troopers who stopped Ramos were required to pursue their traffic-stop-related investigation with diligence. *Kerns,* supra; *Carlson,* 102 Ohio App.3d at 598–599, 657 N.E.2d 591. In our judgment, it is questionable whether 25 to 30 minutes was necessary to complete the citation at issue. However, even assuming that 30 minutes was a reasonable length of time to process the citation and that an additional period of time was required to arrange for Ramos's transportation and the disposition of her vehicle, there is no evidence in the record that the trooper diligently wrote the ticket and began to arrange for the disposition of the vehicle. Sgt. Luebers began to write the ticket 21 minutes after the initial stop of Ramos's vehicle and 13 minutes after he was informed that her license had expired. Had the trooper begun to process the citation at 5:53 a.m., it should have been completed by 6:23 a.m., using the processing time provided by Sgt. Luebers. In addition, at no point during the time that Ramos was seated in the trooper's vehicle was she informed of her options regarding the disposition of her vehicle, nor did the trooper indicate that he would address them after he finished writing the citation. In fact, at 6:16 a.m., Ramos indicated to Sgt. Luebers that she could call her sister, who lived nearby in Huber Heights, to bring a licensed driver. Sgt. Luebers responded, "Let's just wait. Let's wait for this canine and everything." Thus, even though Sgt. Luebers testified that he completed the citation shortly before the canine unit arrived, there is no indication in the record that it was completed in a timely fashion or that the trooper was diligently completing the necessary steps to conclude the traffic related investigation, i.e., the disposition of the vehicle and of the individuals traveling therein. To the contrary, the videotape of the stop demonstrates that Sgt. Luebers did *not* intend to arrange for the vehicle's disposition or for Ramos's transportation until *after* the dog had sniffed the vehicle. In short, the record does not sufficiently support the state's argument that Sgt. Luebers diligently conducted the traffic-related investigation and was continuing to do so diligently when the dog indicated the presence of drugs. See *Kerns.* Accordingly, the record *does not* support the state's argument that Ramos was not detained

beyond the time reasonably necessary to complete the traffic-related investigation.

{¶ 18} In addition, we cannot conclude that the dog sniff occurred within the period of time necessary for Sgt. Luebers to complete all of the traffic stop related activities in a diligent fashion. Because neither Ramos nor her passengers were validly licensed, it is undisputed that they could not drive the SUV from the scene upon the completion of the citation. However, because the trooper did not begin the process of arranging for the disposition of the SUV and its passengers (i.e., he did not allow Ramos to elect whether to leave the car on the berm, to call her sister in Huber Heights, or to call a tow truck), we are forced to speculate as to which option she would have chosen and the time necessary to complete such action. In light of the fact that Ramos was stopped near the Enon exit of Interstate 70, which we note is close to Huber Heights, it is at least possible that a tow truck or Ramos's sister in Huber Heights could have arrived prior to the canine unit. Although it is possible (perhaps likely) that the SUV would have remained stopped on Interstate 70 at 6:42 a.m. had Sgt. Luebers diligently taken steps to make arrangements for the vehicle, Ramos, and the passengers, the record is insufficient to establish such a fact. Accordingly, we cannot conclude, without speculation, that the dog alert would have occurred within the time necessary to complete the traffic-stop-related investigation and to remove the SUV, Ramos, and her passengers from the roadway.

{¶ 19} As an alternative argument, the state asserts that Sgt. Luebers had a reasonable articulable suspicion that the vehicle contained narcotics. Under the facts of this case, this issue presents a close call. It is clear that Sgt. Luebers was able to articulate several specific facts which supported a hunch that Ramos and her passengers were engaged in criminal activity. In particular, Ramos had indicated that she had driven to New York to pick up her sister-in-law and had immediately returned to Dayton. She gave conflicting stories about where she had picked up Soto, first stating that it was Manhattan and later next to a bridge near the Bronx. She was unable to explain how to get to that location or to provide any street name. Although three individuals were traveling, there was no luggage in the vehicle. Sgt. Luebers testified that Soto demonstrated extreme nervousness during the stop—she was breathing heavily, shaking a little, and did not want to make eye contact. The trooper further indicated that Johnson stayed very still, which he interpreted as pretending to be asleep, and repeatedly refused to show his hands when requested to do so. Sgt. Luebers further testified that there was an "immense odor of air fresheners." In addition, dispatch informed Sgt. Luebers that Ramos had been charged with drug trafficking in September 2001, two months prior to the stop.

{¶ 20} Although these facts clearly led Sgt. Luebers to suspect that something was amiss, he was unable to articulate specific facts to support a reasonable suspicion that Ramos's vehicle contained drugs, thus justifying a reasonable detention of Ramos until a drug-sniffing dog could confirm or dispel his suspicions. Between 6:24 a.m. and 6:27 a.m., Sgt. Luebers indicated as much when he spoke with Trooper Meyers.

"Meyers: Do you think they may have committed a crime in New York?

"Luebers: You never know. Could be anything. I suspect some kind of criminal activity * * *.

"Meyers: I don't know what you have here. You thinking actual drugs or currency?

"Luebers: Well, I just don't know. I just suspect some kind of criminal activity. And, uh, if the dog doesn't alert, we'll do what we normally do—send them on their way."

{¶ 21} The present case is similar to that in *State v. Byczkowski* (Nov. 16, 2001), Greene App. No. 2001 CA 31, 2001 WL 1468903, in which we held that an officer lacked a reasonable suspicion to believe that the driver of a vehicle was involved in drug activity. In that case, a state trooper stopped a driver for a speeding violation. Upon approaching the driver, the trooper observed that the driver was more nervous than a reasonable person would be for a speeding stop and that his speech was choppy and fragmented to the extent that he had difficulty forming words. When the trooper requested that the driver produce his vehicle's registration, the trooper observed that he reached into his glove compartment in an awkward manner, shielding the trooper's view of the glove box. After the driver retrieved his registration, his speech improved. The trooper also saw books on the rear seat of the defendant's vehicle but noticed an apparently empty book bag on the back floor. Due to his suspicions, the trooper requested a canine drug unit to assist. The canine unit arrived approximately ten minutes after the trooper completed the traffic citation. The dog "hit" four times for drugs, and the trooper subsequently discovered currency and marijuana.

{¶ 22} Addressing whether the trooper possessed a reasonable articulable suspicion that contraband was in Byczkowski's car so as to justify the ten minute detention after completing the paperwork on the traffic violations, we concluded that he did not. We reasoned that the trooper, "although thinking that something might have been amiss, never articulated or even attempted to articulate what that something was. Although his calling for the drug-sniffing dog supports an inference that he suspected the car was transporting drugs, he never pointed to anything—except perhaps Byczkowski's shielding the glove box—that supported that suspicion." Thus, we concluded that while the trooper had articulat-

ed facts to support a hunch that the car contained contraband, it did not support a reasonable articulable suspicion that it did, and the continued detention of Byczkowski after completing the traffic-violations paperwork was improper.

{¶ 23} In the instant case, Sgt. Luebers unquestionably suspected that Ramos and her passengers may have been involved in some criminal activity. However, as with the trooper in *Byczkowski,* he was likewise unable to articulate what that activity could be. Although the fact that Sgt. Luebers requested a canine drug unit supports an inference that he suspected that the car might be transporting drugs, his statements on the videotape indicate that he thought it "could be anything" and that he suspected "some kind of criminal activity." Thus, reviewing the totality of the circumstances, we conclude that the trooper lacked a reasonable articulable suspicion that Ramos was transporting drugs so as to furnish him with a justification to detain her until the drug-sniffing dog could confirm or dispel that suspicion. Having concluded that Sgt. Luebers lacked a reasonable articulable suspicion that Ramos was transporting drugs, we further conclude that he detained Ramos for an unreasonable length of time. The Ecstacy found in her vehicle should have been suppressed.

{¶ 24} Because we conclude that Ramos was detained for an unreasonable length of time, we need not address her additional arguments that the state trooper acted unreasonably when he checked the passengers' identifications for warrants and that a passenger's possession of a small amount of marijuana should not suggest that she, the driver, was also involved in drug activity.

{¶ 25} Ramos's assignment of error is sustained.

{¶ 26} The judgment of conviction for aggravated possession of drugs will be reversed and the case will be remanded for further proceedings consistent with this opinion.

*Judgment reversed.*

BROGAN and FREDERICK N. YOUNG, JJ., concur.