[Cite as *State v. Balanik*, 2016-Ohio-3511.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2015-L-112** |
| JASON A. BALANIK, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 14 CR 000840.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Alana A. Rezaee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer*, Lake County Public Defender, and *Vanessa R. Clapp*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Jason A. Balanik, pleaded no contest to possession of heroin, a fifth-degree felony, after the trial court's denial of his motion to suppress. He appeals alleging a denial of his due process rights and that the search leading to his arrest violated his right against unreasonable searches and seizures. We affirm.

{¶2} Balanik was the front seat passenger in his girlfriend's car when a Mentor Police Officer pulled her over for a marked lane violation and failure to signal. Her brother was in the backseat. The officer described the occupants as very nervous explaining that they were shaking and would not make eye contact. Thus, he asked the driver to step out of the vehicle. The officer noticed a blood-stained napkin on the floor of the driver's side of the vehicle. The driver and Balanik subsequently gave the officer differing stories as to where they were headed that night. The officer called for a canine unit and began the license and registration checks. He then drafted the written warnings to the driver for the traffic violations and to Balanik for his seatbelt violation.

{¶3} Balanik was detained for a few minutes after the warnings were issued to await arrival of the canine unit. Ultimately, the drug-sniffing canine alerted indicating that the vehicle contained drugs. The police searched the occupants and found heroin in Balanik's right front watch pocket. He was subsequently indicted on one count of heroin possession in violation of R.C. 2925.11.

{¶4} Balanik does not challenge the basis for the original stop, but argues that he was illegally detained after the officer issued the warnings. He claims the trial court erred in denying his motion to suppress the drugs found in his pocket. His sole assigned error asserts: "The trial court erred by denying the defendant-appellant's motion to suppress in violation of his due process rights guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 14, Article I of the Ohio Constitution."

{¶5} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8.

The trial court judge sits as the trier of fact evaluating witness credibility and weighing the evidence, and on appeal we "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.,* citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 1 Ohio B. 57, 437 N.E.2d 583 (1982). Upon accepting the facts as true, this court "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶6} "The Fourth Amendment to the United States Constitution provides, 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, particularly describing the place to be searched, and the persons or things to be seized.' Article I, Section 14 of the Ohio Constitution contains almost identical language, and we have interpreted it as affording at least the same protection as the Fourth Amendment. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239, 1997 Ohio 343, 685 N.E.2d 762 (1997).

{¶7} "'The touchstone of the Fourth Amendment is reasonableness.' *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). '"[W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case."' (Brackets sic.) *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), quoting *Cooper v. California*, 386 U.S. 58, 59, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). 'Reasonableness, in turn, is measured in objective terms by examining the totality of the

circumstances.' *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

**{¶8}** "'Under the Fourth Amendment, warrantless searches are per se unreasonable without prior approval by a judge or magistrate, subject to only a few specific exceptions. *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)." *State v. Leak*, __ Ohio St.3d. __, 2016-Ohio-154, ¶13-15.

**{¶9}** The United States Supreme Court has explained that a canine search or sniff in a public place does not constitute a search under the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

**{¶10}** "[T]he manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents * * *, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods." *Id.*

**{¶11}** Accordingly, a police officer "need not have a reasonable suspicion that a vehicle contains contraband prior to summoning a canine drug unit" for the duration of the time needed to complete the initial traffic stop. *State v. Wilkins*, 2d Dist. Montgomery No. 20152, 2004-Ohio-3917, ¶12, citing *United States v. Place* (1983), 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110, *State v. Heard*, Montgomery App. No. 19323, 2003-Ohio-1047. Upon stopping a motorist for a traffic violation, an officer may

4

delay the driver only for the amount of time necessary to issue a ticket and needed to verify the driver's license, registration, and plates. *State v. Eggleston*, 11th Dist. Trumbull No. 2014-T-0068, 2015-Ohio-958, ¶21, citing *State v. Howard*, 12th Dist. Preble Nos. CA2006-02-002 & CA2006-02-003, 2006-Ohio-5656, ¶15; *Rodriguez v. United States*, ___U.S.___, 135 S.Ct. 1609, 1612 (2015).

{¶12} However, a traffic stop *may* become unconstitutionally prolonged in violation of the motorist's Fourth Amendment rights when the motorist is detained because of the request for a dog search. A motorist may only be detained beyond the normal time frame needed for the traffic stop "when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop." (Citations omitted.) *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶12-15. The officer must have a reasonable suspicion that a vehicle contains drugs to permissibly detain the occupants to await the arrival of a drug-sniffing canine. *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6365, 801 N.E.2d 523, ¶13 (2d Dist.). Whether the officer conducting the stop has a reasonable suspicion of drugs in the vehicle is based on the totality of the circumstances as viewed through the officer's perspective. *Id.*, citing *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶14.

{¶13} Balanik argues that his continued detention and the subsequent canine search were illegal seizures because the canine search in his case occurred after the necessary time period required for the traffic stop, and there were no articulable facts indicating that the vehicle contained drugs.

{¶14} In *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, the Ohio Supreme Court addressed a similar case involving a routine traffic stop. An Ohio State Highway Patrol Trooper pulled over Batchili's van for a marked-lanes violation. Upon approaching the vehicle, the trooper smelled deodorizer in the vehicle and saw Batchili's hands shaking. Batchili did not own the van he was driving and gave conflicting answers as to who owned it. The trooper also noticed that the back of the van contained boxes in disarray that were covered with blankets. The trooper called her partner for backup and a canine walk around to detect the presence of drugs. While waiting for Batchili's criminal background results, the dog alerted that drugs were present in the van. As a result of the dog's alert, the troopers searched the van. They did not find illegal drugs, but found boxes of pirated videos and DVDs. *Id.* at ¶2-6.

{¶15} On appeal, the Sixth District found that the traffic stop did not reflect sufficient cause to prolong the stop and that Batchili's continued detention was an illegal seizure. *Id.* at ¶7. The Supreme Court disagreed.

{¶16} The *Batchili* Court first concluded that the stop was not prolonged beyond the scope of the initial stop by the trooper's request for a canine search since the dog arrived and conducted its search before the driver's background search had been completed. Notwithstanding, it held that "assuming the detention was actually prolonged by the request for a dog search, 'the detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop.'" (Brackets sic.) (Citation omitted.) *Id.* at ¶14-15.

{¶17} The Supreme Court also emphasized that the facts need to be viewed as a whole in determining whether the stop was justified, stating: "the 'reasonable and articulable' standard applied to a prolonged traffic stop encompasses the totality of the circumstances and that a court may not evaluate in isolation each articulated reason for the stop." *Id*. at ¶17. Thus, the court of appeals erred in viewing the evidence in isolation, and its decision was reversed. *Id*. at ¶17, 22.

{¶18} In Balanik's case, the canine search occurred after the completion of the officer's issuance of a warning and the time period necessary for conducting the requisite license and registration checks. Thus, the question before us is whether the officer had reasonable, articulable facts that illegal drugs were present in the vehicle warranting Balanik's further detention to wait for the canine unit.

{¶19} Patrolman Don Swindell testified at the suppression hearing. He explained that upon stopping the vehicle in which Balanik was traveling, the driver, Balanik, and the backseat passenger all appeared very nervous. They were shaking and breathing heavily and very deeply. Swindell indicated that the occupants appeared more nervous than most people he encountered during a basic traffic violation. Swindell further explained that he could see the driver's pulse in her neck and that she would not look at him while answering his questions.

{¶20} Swindell had the driver exit the vehicle, and she told him that she was taking her boyfriend, Balanik, home and that she was then going to a friend's house. Swindell approached Balanik, who was sitting in the front seat, to ask him for his identification since he was not wearing his seatbelt. Balanik advised that they had been "out driving around" and that they were then headed to a friend's house.

7

{¶21} Swindell saw a brown paper napkin with what appeared to be "little red blood spots" on it in the vehicle. He explained that he learned through his training and experience that "little dabs of blood on a napkin can be indicative of intravenous drug use. It's typical with people that shoot intravenous drugs that they bleed and they use a napkin or some other type of cloth just to dap the blood." Swindell did not see any track marks on any of the occupants, and he did not secure the blood-dabbed napkin as evidence.

{¶22} Based on the conflicting stories, nervous behavior by the occupants, and the presence of the blood-dabbed napkin, Swindell believed that drug activity was possibly occurring in the vehicle. The napkin was on the floor of the driver's side of the car where the driver's feet would have been. He saw it when she exited the vehicle. Thus, he requested a canine unit.

{¶23} Thereafter, Swindell began to write the written warning for the traffic violations and ran the driver and passengers' information for a LEADS check. During this approximately 10-12 minute time period, Swindell described the passengers' behavior as odd because both continued to look only straight ahead. The canine unit arrived and alerted the officers as to the presence of drugs. Swindell searched Balanik and subsequently found a piece of paper in his front, right watch pocket that contained heroin. The driver's purse also contained marijuana, prescription medication that was not prescribed to her, and a syringe admittedly used for heroin.

{¶24} The Twelfth District Court of Appeals in *State v. Gomez*, 12th Dist. Butler No. CA91-10-164, 1992 Ohio App. LEXIS 3752 (July 20, 1992), concluded that a bloody napkin recovered from the floor of the owner's vehicle was relevant evidence of drug

possession to establish that the defendant knowingly possessed a controlled substance. *Id.* at *4. In *State v. Elliott*, 1983 Ohio App. LEXIS 13311, 2d. Dist. Clark No. 1741, *14 (May 6, 1983), the Second District explained that syringes, vials, and bloody napkins in plain view were clearly indicative of drug use to an experienced police officer.

{¶25} In *State v. Casey,* 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, the officer testified that after completing field sobriety tests on the driver, he detained him to wait for the arrival of the drug-sniffing dog. The officer explained that he was not sure if the defendant had a gun or drugs, but that he believed something illegal was in the car in light of the defendant's very nervous behavior when asked about the contents of his car. The court of appeals explained, however, that the motorist's sudden, nervous behavior, alone, was insufficient to warrant the driver's detention beyond the time period necessary to issue the citation and run his license and registration. Thus, the drugs and paraphernalia discovered after the canine search should have been suppressed since the officer lacked a reasonable, articulable suspicion that the vehicle contained drugs. *Id.* at ¶30-31.

{¶26} In *State v. Stephenson*, 12th Dist. Warren No. CA2014-05-073, 2015-Ohio-233, however, the Twelfth District Court of Appeals concluded that the officer in that case did have a reasonable, articulable suspicion of drug activity warranting the extended traffic stop to wait for the arrival of the canine unit. In *Stephenson*, the trooper's testimony included the following observations: the driver and passenger had rigid postures and that they stared straight ahead when their vehicle passed the patrol car; the driver was driving with his arms in a locked position; the driver did not initially make eye contact and was very nervous; the car was traveling on a known "drug

corridor;" and the two men gave inconsistent statements as to how long they had known each other, where they were going, and how long they intended to stay. Thus, the trooper's prolonged detention of the vehicle beyond the time period necessary to issue the citation for the initial stop was reasonable and did not violate the defendant's constitutional rights. *Id.* at ¶23-26.

{¶27} Like the trooper in *Stephenson*, supra, the officer in Balanik's case had reasonable and articulable facts indicating the presence of drugs or drug use in the vehicle. Balanik's continued detention was based on the collective nervousness of the occupants of the car, the inconsistent statements as to where the occupants were going that night, and the presence of the blood-stained napkin, which is specifically indicative of intravenous drug use. Thus, our independent review confirms that the patrolman had reasonable, articulable facts that drug use was occurring in the vehicle, and as such, his prolonged detention of Balanik to wait for the canine unit was appropriate. Accordingly, Balanik's sole assigned error lacks merit, and the trial court's decision is affirmed.

CYNTHIA WESTCOTT RICE, P.J.,

DIANE V. GRENDELL, J.,

concur.