[Cite as *State v. Skaggs*, 2021-Ohio-2803.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

ROBERT A. SKAGGS,

    DEFENDANT-APPELLANT.

CASE NO. 3-20-13

O P I N I O N

Appeal from Crawford County Common Pleas Court
Trial Court No. 19-CR-0487

**Judgment Affirmed**

**Date of Decision: August 16, 2021**

APPEARANCES:

    *Edwin M. Bibler* **for Appellant**

    *Ryan M. Hoovler* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Robert Skaggs ("Skaggs") brings this appeal from the judgment of the Common Pleas Court of Crawford County denying his motion to suppress. On appeal, Skaggs claims that 1) the stop exceeded the scope and duration necessary to complete the traffic stop and 2) there was no reasonable, articulable suspicion for continuing the stop. For the reasons set forth below, the judgment is affirmed.

{¶2} On December 3, 2019, the Crawford County Grand Jury indicted Skaggs on one count of Possession of Drugs in violation of R.C. 2925.11(C)(1)(a), a felony of the fifth degree. Doc. 1. The indictment was based upon drugs found during a traffic stop on November 12, 2019. Doc. 1. On March 25, 2020, Skaggs filed a motion to suppress the evidence. Doc. 19. A hearing was held on the motion on June 18, 2020 and the motion was eventually denied. Doc. 35.

{¶3} At the hearing, Captain Joseph Greathouse ("Greathouse") testified as follows. In 2016, the police received information that Skaggs may be bringing drugs into the area and selling them when he came up to visit family. Tr. 14-17. On May 18, 2018, the police received a tip from an informant that Skaggs was selling drugs at an address inside Bucyrus. Tr. 19. The informant reported that the drugs arrived at the address via FedEx. Tr. 20. On July 16, 2019, the police received a letter claiming that Skaggs was selling narcotics in the Bucyrus area. Tr. 22. Then on July 21, 2019, the police received another tip that Skaggs, who lives in Tennessee,

would sell drugs in Bucyrus when he was in town to visit his girlfriend and identified the vehicle he was driving as a mint green Chrysler 300 with Tennessee tags. Tr. 22-23. The tip gave substantial information regarding the names of the people involved in the trafficking, the methods used, and the ways the drugs are hidden while being transported. Tr. 22-26. On October 11, 2019, the police received another tip alleging that Skaggs was supplying drugs to a local dealer, drove a silver Chrysler 300, kept the meth in a black bag and stayed at the Holiday Inn when in town. Tr. 26-27. The police also had an informant claiming that his supplier received his drugs from Skaggs. Tr. 27. Greathouse testified that based upon all of this information, he was looking "to establish probable cause to obtain a GPS search warrant for [Skaggs] car" when he saw an opportunity to stop Skaggs' vehicle. Tr. 27-28. To get the information, Greathouse was going out in the evenings, locating Skaggs, and watching him to see what he was doing. Tr. 28. Greathouse did this three or four times in the month before the stop. Tr. 28. On November 8, Greathouse observed what he suspected was a drug transaction when a person on a motorcycle stopped outside of the residence of Skagg's girlfriend, went inside for a few minutes then left. Tr. 29. Approximately two weeks before the stop, Greathouse observed Skaggs at a location where the target of a drug investigation was also present. Tr. 30.

{¶4} Greathouse testified that on November 12, 2019, he was working in an unmarked car checking "hot spots" for drug activity. Tr. 31. While at one location,

he observed Skaggs driving his light green car with Tennessee tags. Tr. 31-32. Skaggs went to a residence while leaving his car running, then returned a couple minutes later. Tr. 32. Greathouse then contacted Officer Jason Pennington ("Pennington") and told him that he suspected Skaggs was involved in drug activity. Tr. 32. This suspicion was because Skaggs "acted like he was in a hurry". Tr. 33. Greathouse watched Skaggs driving away and asked Pennington to follow him "in an attempt to see if there's any probable cause to initiate a stop." Tr. 33. Both Greathouse and Pennington lost sight of Skaggs, but found him approximately five minutes later. Tr. 33. Greathouse then saw Skaggs stop at a stop sign, but he stopped beyond the stop bar. Tr. 34. Skaggs then made a right turn that caused him to travel left of center and appeared to be on his phone. Tr. 34. Greathouse then contacted Pennington and advised him of the violations so he could be stopped. Tr. 34. At the time of contacting Pennington, the intent was to search the vehicle for drugs. Tr. 34. The plan was to stop the vehicle and use a canine sniff to search the vehicle. Tr. 35.

{¶5} On cross-examination, Greathouse admitted that none of the tips received were related to November 2019. Tr. 53. Greathouse also admitted that the home that he was observing on November 8, 2019, when he saw the motorcycle come and go quickly belonged to a relative of Skaggs which could explain why he was there. Tr. 54. As to the events of November 12, Greathouse saw Skaggs go to a residence where he only stayed a couple of minutes, but did not see Skaggs carry

-4-

anything in or out of the house. Tr. 55. The only thing suspicious was that he appeared to be in a hurry. Tr. 55. The video of the stop showed that Skaggs was stopped at approximately 8:15 pm. Tr. 56. The canine was requested at 8:20 pm. Tr. 57. The officers stopped attempting to write the warning citation at 8:20 pm as well. Tr. 61. The dog did not arrive until 8:38 pm. Tr. 61. Both sides stipulated that since only the time elapsed mattered, not the actual times, they would use the times shown on the police car's video. Tr. 67-68.

{¶6} Pennington testified that Greathouse contacted him on November 12, 2019, and told him the traffic violations Greathouse had observed. Tr. 70-71. Greathouse wanted him to conduct a traffic stop based upon a stop bar violation and traveling left of center. Tr. 71. Pennington indicated that the vehicle was a Chrysler with Tennessee plates and was in working condition. Tr. 71-72. Pennington observed that Skaggs' left arm was shaking and Skaggs stated that he may have went left of center because he "wasn't from the area" and that he was using the GPS on his phone. Tr. 72. Pennington believed that Skaggs was lying because he was from the area and that in his opinion, Skaggs was shaking because he was nervous. Tr. 72. Pennington then asked permission from Skaggs to search the vehicle before he returned to the patrol car to write the warning, but Skaggs said no. Tr. 73. Pennington then returned to the patrol car and requested a canine and that it be expedited. Tr. 74. Pennington then went back to the vehicle and had Skaggs exit the vehicle so that he could conduct a pat down search for officer safety. Tr. 74.

This concern, pursuant to a statement on the video by Pennington, was based upon the shaking arm. No weapons were found on Skaggs, just some cash. Tr. 74. Pennington testified that Skaggs, when questioned about the cash, indicated it was for his rent in Tennessee. Tr. 74. Pennington indicated that this was a red flag because Skaggs also told him he did not know exactly how much cash was there. Tr. 75. In his experience people selling drugs frequently have large amounts of cash on them. Tr. 75. After searching Skaggs, Pennington then went back to his patrol car. Tr. 75. In the meantime, another officer in the patrol car wrote the written warning for the violations. Tr. 76. Pennington testified that he then called dispatch because he was unhappy that the canine had not arrived. Tr. 77. Dispatch informed him that since the canine unit was off, they had not called him yet, so Pennington called Deputy Chris Hulsmeyer ("Hulsmeyer") to request his canine unit. Tr. 77-78. Pennington then did nothing until Hulsmeyer arrived with the canine. Tr. 78. Once the canine alerted to the presence of narcotics, Pennington conducted a search of the vehicle where he found a small bag of methamphetamine. Tr. 78.

{¶7} On cross-examination Pennington admitted that he actually conducted two pat down searches of Skaggs and did not remove anything from Skaggs' pockets. Tr. 79. When Pennington felt the money he asked what it was and if he could remove it. Tr. 80. After seeing it was money, Pennington put it back in Skaggs' pocket. Tr. 80. Skaggs told Pennington he was from Tennessee, the car was registered in Tennessee, and Skaggs had a Tennessee driver's license. Tr. 80.

Pennington admitted that he knew Skaggs was a musician and had just played a show in Bucyrus. Tr. 81. Pennington acknowledged that musicians are sometimes paid in cash and that could be the source of the cash. Tr. 81. A review of the vehicle tags showed that it was registered to Skaggs. Tr. 81. Skaggs' license was valid and there were no warrants for him. Tr. 82. Pennington then began writing the warning citation. Tr. 82. Pennington admitted that he was frustrated that the canine was not there yet. Tr. 82.

{¶8} Hulsmeyer testified that he is employed by the Crawford County Sheriff's Office as a canine handler. Tr. 88. On November 12, 2019, he was working with a qualified drug detection canine. Tr. 89. On that evening, he was not working, but received a request from the Bucyrus Police Department to go to the scene of a traffic stop. Tr. 90. Hulsmeyer indicated that they made one lap around the car clockwise and then turned to go around counterclockwise. Tr. 90. The canine alerted on the rear passenger door during the second lap of the vehicle. Tr. 91. After that Hulsmeyer returned the canine to his vehicle and observed the search until Pennington found what was suspected as methamphetamines. Tr. 91.

{¶9} On June 22, 2020, the trial court entered judgment denying the motion to suppress. Doc. 35. Skaggs later entered into a written plea of no contest to the indictment. Doc. 37. The trial court accepted the plea and sentenced Skaggs to five years of community control. Doc. 38. Skaggs filed a timely notice of appeal. Doc. 40. On appeal, Skaggs raises the following assignments of error.

## First Assignment of Error

**The trial court erred in denying [Skaggs'] motion to suppress the evidence where the stop of [Skaggs'] vehicle by officers of the Bucyrus Police Department and Crawford County Sheriff's Office exceeded the scope and duration necessary and there was no reasonable, articulable suspicion that drug activity was occurring on November 12, 2019.**

## Second Assignment of Error

**The trial court erred in denying [Skaggs'] motion to suppress the evidence where there was no reasonable, articulable suspicion that drug activity was occurring at the time of the stop of [Skaggs'] vehicle on November 12, 2019.**

{¶10} In both assignments of error, Skaggs claims that the trial court erred

in denying his motion to suppress.

> **Under appellate review, motions to suppress present "mixed questions of law and fact."** *State v. Yeaples*, **180 Ohio App.3d 720, 2009-Ohio-184, 907 N.E.2d 333, ¶ 20 (3d Dist.).**
>
> **"When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.)**
>
> **State v. James, 2016-Ohio-7262, 71 N.E.3d 1257, ¶ 8 (3d Dist.), quoting State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.**

*State v. Sullivan*, 2017 -Ohio- 8937, ¶ 11, 102 N.E.3d 86 (3d Dist.).

**{¶11}** Here, Skaggs does not dispute that the stop of the vehicle was valid. The only issue is whether the stop was extended beyond a reasonable time. This Court recently addressed the issue of stops extended for an unreasonable time to allow time for a canine to arrive on the scene in *State v. Lawler*, 3d Dist. Union No. 14-19-25, 2020-Ohio-849, 152 N.E.3d 962. In *Lawler*, the defendant was driving on US 33 near Marysville, Ohio, when a state trooper saw them and thought they looked suspicious. *Id*. at ¶ 2. The trooper followed the vehicle and stopped it around 5:16 p.m. after the driver changed lanes without using the turn signal. *Id*. After speaking with the driver and the passenger for a few minutes, the trooper learned that neither of them were the registered owners of the vehicle. *Id*. at ¶ 3. The trooper asked dispatch to contact the registered owner and also requested the presence of a canine based upon the behavior of the vehicle's occupants. *Id*. At 5:24 p.m., dispatch notified the trooper that the occupants were permitted to use the vehicle, but the defendant was supposed to be the one driving. *Id*. at ¶ 4. The trooper also learned that the driver had a suspended license. *Id*. The trooper did not continue to process the traffic stop or return to the vehicle to speak with the occupants, but instead chose to remain in his vehicle until the canine arrived at 5:49 p.m. *Id*. The canine walked around the vehicle and alerted to the presence of drugs, which led to the arrest of the defendant. *Id*. The defendant was subsequently indicted on several felonies. *Id*. at ¶ 5. He eventually filed a motion to suppress alleging that the trooper had unreasonably prolonged the traffic stop to await the arrival of the canine. *Id*. at

¶ 6. The trial court agreed and the State filed a notice of appeal alleging that the stop was not unreasonably prolonged. *Id*. at ¶ 7-8.

{¶12} On appeal, this Court affirmed the judgment of the lower court. *Id*. at ¶ 48. When reviewing the issue, this Court held that a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required" to issue a ticket. *Id.* at ¶ 13 quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).

> "'**When an officer detains a motorist for a traffic violation, the stop should delay the motorist only for the amount of time necessary to issue a citation or warning.'"** *State v. Hall*, **2d Dist. Darke, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 8, quoting** *State v. Hill*, **2d Dist. Montgomery No. 26345, 2016-Ohio-3087, ¶ 9, citing** *State v. Batchili*, **113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12;** *State v. Troutman*, **3d Dist. Marion No. 9-11-17, 2012-Ohio-407, ¶ 22 ("[T]he duration of the stop 'is limited to "effectuate the purpose for which the initial stop was made." ' "), quoting** *State v. Smith*, **117 Ohio App.3d 278, 285, 690 N.E.2d 567 (1st Dist.1996), quoting** *State v. Venham*, **96 Ohio App.3d 649, 655, 645 N.E.2d 831 (4th Dist.1994). " 'The reasonable stop time includes the amount of time it takes to conduct a computer check on the driver's license, registration, and vehicle plates.' "** *Hall* **at ¶ 8, quoting** *Hill* **at ¶ 9;** *Rodriguez v. United States*, **575 U.S. 348, 355, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015) ("[A]n officer's mission includes 'ordinary inquiries incident to [the traffic] stop' * * * [such as] checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."), quoting** *Caballes* **at 408. ""In determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation."""** *Batchili* **at ¶ 12, quoting** *State v. Howard*, **12th Dist. Preble Nos. CA2006-02-002 and CA2006-02-003, 2006-Ohio-5656, ¶ 15, quoting** *State v. Carlson*, **102 Ohio**

**App.3d 585, 598-599, 657 N.E.2d 591 (9th Dist.1995).**

*Lawler* at ¶ 14. *Lawler* noted that a canine sniff is not a typical action taken in an ordinary stop because it does not have "the same close connection to roadway safety as the ordinary inquiries" and is not a part of an officer's traffic mission. *Id.* at ¶ 15 quoting *Rodriguez, supra.* An officer is permitted to conduct a canine sniff of a vehicle during a traffic stop without reasonable suspicion of additional illegal activity as long as it is completed before the traffic stop would normally end. *Lawler* at ¶ 15. However, if the stop is extended to conduct a canine sniff, the officer must have reasonable suspicion based upon additional facts to believe that the vehicle contains drugs in order to detain the driver for the extra time it takes for the canine to arrive. *Id.* at ¶ 16. *See State v. Elliott*, 7th Dist. Mahoning No. 11 MA 182, 2012-Ohio-3350, ¶ 23; *Batchili, supra* at ¶ 15 (holding that the stop may be extended beyond the normal time if additional facts are found during the stop to give rise to a reasonable, articulable suspicion of criminal activity). The analysis of whether there is reasonable and articulable suspicion is based upon the collection of factors, not on a single individual factor. *Lawler* at 16.

{¶13} When reviewing the factors presented by the officer in *Lawler*, the trial court noted that the stop was for a minor traffic offense, but that the trooper learned that the driver's license had been suspended and that the vehicle had been loaned to the defendant. *Id.* at ¶ 17. The trial court noted that the stop went on for approximately 28 minutes before the drug dog arrived on the scene. *Id.* This Court

noted in its review that the trooper had testified that the driver and defendant reacted oddly to the stop by the driver throwing his head back against the seat and only rolling the window down part way. *Id*. at ¶ 19. The trooper also indicated that the driver and the defendant appeared to be lying to him about why they were using the vehicle. *Id*. The trooper noted that both the driver and the defendant were "staring straight ahead and sitting upright and rigid" *Id*. at ¶ 20. This behavior was why the trooper called for the canine. *Id*. The State argued on appeal that based upon the trooper's testimony about the additional factors, the extension of the traffic stop was permissible. *Id*. at ¶ 29. This Court disagreed. *Id*. at ¶ 30.

{¶14} This Court held that although these actions and learning that the driver lacked a valid license would provide some justification for extending the stop, the extension was only permitted "for such time as would have been reasonably necessary to investigate these additional potential infractions." *Id*. at ¶ 31. *See United States v. Winters*, 782 F.3d 289, 296 (6th Cir.2015) (holding the extension of a traffic stop based on new reasonable suspicion is limited in the scope and duration to what is reasonable). While the stop may be extended, the officer still is required to diligently pursue the investigation to either confirm or dispel the suspicions quickly." *Lawler* at ¶ 31. After reviewing the record in *Lawler*, this Court held that the trooper did not diligently pursue his investigation because by his own admission, he did nothing addition to further the investigation, instead just waiting for the canine to arrive. *Id*. at ¶ 32. This Court determined that the canine sniff did not

occur within the reasonable time necessary to complete a normal traffic citation. *Id.* at ¶ 33 (trooper testified normal stop would ideally be 3-4 minutes). *See In re $75,000.00 U.S. Currency*, 8th Dist. Cuyahoga, 2017-Ohio-9158 (the longest a traffic stop should take is 15 minutes); *State v. Eggleston*, 11th Dist. Trumbull N. 2014-T-0068, 2015-Ohio-958, 29 N.E.3d 23 (typical traffic stop takes 8-10 minutes when a citation is issued); and *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523 (2d Dist.) (holding that even assuming that 30 minutes was justified for a stop, the officer must still diligently be writing the citation and not just waiting for the canine to arrive). Since the trooper was not diligently finishing the traffic stop and his "primary motivation for extending the traffic stop may have been to allow for an exterior sniff of the [vehicle]", this Court held that he had impermissibly extended the stop. *Lawler* at ¶ 35.

{¶15} This Court then went on to discuss how the stop may still be prolonged as long as the law enforcement officer has a reasonable articulable suspicion that the vehicle contains drugs at that time. *Id.* at ¶ 36. Although we are to look at the factors as a whole when evaluating whether there was a reasonable and articulable suspicion of drug activities, "it is appropriate to assess the extent to which a given factor is [individually] indicative of criminal activity." *Id.* at ¶ 37 citing *United States v. Bowman,* 884 F.3d 200 (4th Cir.2018) and *United States v. Stepp*, 680 F.3d 651 (6th Cir.2012). In *Lawler*, this court reviewed the factors and found that although the defendant and the driver may have shown odd behavior that indicated

nervousness, there were no signs of heightened nervousness, no indication of bizarre or implausible explanations for what they were doing, and nothing in sight that would indicate criminal activity. *Lawler, supra.* This Court then affirmed the judgment of the trial court granting the motion to suppress.

{¶16} In this case, there is no question that the primary purpose of this stop was to obtain a canine sniff of the vehicle in order to search the vehicle for drugs. Greathouse testified that this was the purpose. Tr. 34. Pennington testified that after Skaggs denied his request to search the vehicle, he returned to the patrol car to call for the canine unit and to write the warning citation. Tr. 74. The undisputed evidence was that the warning citation was never issued and that Pennington and the other officer who was in his patrol car and writing the citation stopped writing it when they learned that the dog would be delayed. Pennington admitted that he was not proceeding with the investigation into the basis for the stop, which allegedly was Skaggs crossing the stop bar and using his phone while driving. Pennington was frustrated that the dog did not appear for approximately 23 minutes. Even the trial court conceded that if this had been a "routine traffic stop and not a drug investigation * * * [t]he evidence would be excluded, because through probably nobody's real fault, the stop was extended longer than necessary." Tr. 103. The trial court noted that this matter could have been concluded in 10-15 minutes at most. Tr. 104. Thus, it is clear that Skaggs was detained beyond the time reasonably required to complete the traffic-related investigation.

**{¶17}** Since the stop was extended past the permissible time, the question then becomes whether the officer had a reasonable, articulable suspicion that the vehicle contained drugs or that the occupant was engaged in a drug-related activity at that time. *Lawler* at ¶ 36. This Court notes that the question is about the criminal activity at that time, not just whether the officer has a reasonable, articulable suspicion that the driver may be a criminal at some other time. *See State v. Hawkins*, 12th Dist. Fayette No. CA2017-07-013, 2018-Ohio-1983, ¶ 16 (traffic stop is permissible if based upon reasonable, articulable suspicion that criminal activity is imminent). As in *Lawler*, this court needs to look at the factors. There were 4 factors pointed out as the basis for the reasonable articulable suspicion: 1) lying about using GPS when stopped as an explanation for being on his phone; 2) the fact that this was a pretextual stop; 3) the shaky arm; and 4) the cash that Skaggs claimed was for his rent. Like in *Lawler*, we will look at these factors individually to see the extent it is indicative of criminal behavior at the time of the stop.

**{¶18}** The first element was the trial court's determination that Skaggs was being dishonest in his claim that he was on his phone using Mapquest. The trial court determined he was not honest because the trial court did not think a person who was originally from Bucyrus would need to use Mapquest in town. However, a review of the video shows that the officer asked Skaggs if he was texting, which Skaggs denied and said he was using Mapquest. The fact that one may not admit to texting while driving, which could result in an additional ticket, does not necessarily

-15-

indicate they are engaged in criminal activity at that time. Additionally, just because a person may be familiar with an area does not mean that they may not need directions to find a specific location. Familiarity does not equal knowing where everything is located without help, thus the explanation was reasonable and standing alone is not necessarily indicative that any criminal activity was occurring.

{¶19} The second element was that this was a pretextual stop. All of the testimony was that the officers were looking for a reason to stop him so that they could search the car. This was based upon prior tips they had received that indicated Skaggs was dealing drugs. However, these tips were not for the relevant time period, but rather for past situations. The closest tip in time was from a month before the stop. Two weeks before the stop, Greathouse testified that he saw a motorcycle pull up to the home of Skaggs' girlfriend, enter the house, and leave quickly, which he thought was indicative of drug activity. However, this was nothing more than supposition as the motorcycle was not stopped and no investigation was completed regarding that incident. Greathouse even admitted that the only involvement he personally knew of regarding Skaggs before the stop was that in the two weeks prior to the stop, Skaggs was seen entering a home frequented by one of Greathouse's targets. Tr. 29-30. Greathouse testified that on the day of the stop, he saw Skaggs go into a house that was owned by a relative of Skaggs. There was no testimony whether anyone else was home at the time or that anyone else came to the home while Skaggs was there. Greathouse testified that Skaggs

was not there for very long, but Greathouse admitted that he did not observe Skaggs carrying anything in or out of the home. Greathouse's explanation for suspecting that Skaggs might have drugs in the car was that Skaggs appeared to be in a hurry. Being in a hurry can describe many people on a daily basis. It alone is not necessarily indicative of criminal activity. Even the trial court noted that before the stop "there was nothing extra" to provide reasonable, articulable suspicion for extending the stop. Tr. 108.

{¶20} The third factor was that Skaggs' arm was shaking. Pennington stated on the video that the reason he conducted the pat down search was because of the shaky arm. Skaggs' response was that it always shakes. Pennington testified that Skaggs' told him it was shaking because it was cold from brushing snow off the front windshield. Pennington testified that he was suspicious of that explanation because the jacket was not wet.[1] However, the trial court even noted that since it was only one arm that was shaking, it could be the result of nerve damage. Tr. 108. Merely having a shaky arm is not alone necessarily indicative that any criminal activity was occurring.

{¶21} The fourth factor the trial court noted was the cash in Skaggs' pocket. The trial court acknowledged that the amount of cash was not suspicious. Tr. 111. However, the trial court noted that Skaggs "said it was for his rent and when he

---

[1] A review of the video shows that Skaggs appeared to be wearing a leather coat. This would make it very easy to brush the snow off before it melted on the surface and soaked into the coat leaving a wet spot.

didn't know what his rent was, that again I believe is suspicious." Tr. 111. A review of the video and the testimony of Pennington shows that Skaggs was never asked what the amount of his rent was. Pennington testified that he asked Skaggs why he had the money and Skaggs said it was to pay his rent. Tr. 74. Then Pennington asked him how much money was there and Skaggs said he did not know. Tr. 75. Although Pennington testified that in his experience people with an "abundancy of cash" that don't know how much they have are likely to be involved in drugs, the trial court found the amount of cash to not be suspicious, so it would not qualify as an "abundancy" of cash. The mere fact that a person does not know exactly how much cash is in their pocket or wallet at a given time is not alone indicative of criminal activity.

{¶22} The trial court found that although the evidence in this case was not "overwhelming" that the officers had reasonable articulable suspicion, the trial court believed that the State had met its burden. Based upon that finding the trial court denied the motion to suppress. As discussed above, none of the individual factors taken alone would provide reasonable, articulable suspicion for delaying the traffic stop. However, when taken as a whole, they could be found to provide a reasonable, articulable suspicion. *See State v. Batchili*, *supra* at ¶ 17, (the totality of the circumstances must be evaluated to determine whether there is reasonable and articulable suspicion to prolong a traffic stop). The trial court made such a determination in this case after it made findings of fact based on the evidence before

it. This Court is required to accept the findings made by the trial court and may not reverse merely because we may have reached a different conclusion. Thus, we do not find that the trial court erred in denying the motion to suppress. The assignments of error are overruled.

{¶23} Having found no error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Crawford County is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**