[Cite as *State v. Adams*, 2017-Ohio-7186.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-755 |
| v. | : | (C.P.C. No. 15CR-4042) |
| Richard J. Adams, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 10, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Joseph R. Landusky, II*; *The Stavroff Law Firm*, and *Jeffrey T. Stavroff*, for appellant. **Argued:** *Jeffrey T. Stavroff.*

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Richard J. Adams, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of possession of heroin, in violation of R.C. 2925.11, and trafficking in heroin, in violation of R.C. 2905.03. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On August 19, 2015, a Franklin County Grand Jury indicted appellant for possession of heroin in violation of R.C. 2925.11, a felony in the first degree, and trafficking in heroin, in violation of R.C. 2905.03, a felony in the first degree. On

January 21, 2016, appellant filed a pre-trial motion to suppress the evidence uncovered in a search of his vehicle. On September 21, 2016, the trial court conducted an evidentiary hearing on the motion. At the suppression hearing, the trial court heard testimony from several witnesses, including appellant, regarding the traffic stop that resulted in appellant's arrest.

{¶ 3} Detective Jeremy Ehrenborg of the Columbus Division of Police testified that in 2015, he was involved in an ongoing investigation of a group of individuals believed to be trafficking in heroin in the Columbus area. Ehrenborg testified that in the course of the investigation, officers obtained warrants to place GPS tracking devices on vehicles operated by several suspects, including Manuel Montero and Anival Acosta. Officers also employed wire tapping devices and conducted "trash pulls" from various apartments occupied or frequented by Montero and Acosta. (Tr. at 25.) As a result of the investigation, police believed that Montero's heroin trafficking ring used an apartment in the Easton area as a "stash" for heroin. (Tr. at 24.)

{¶ 4} On June 11, 2015, appellant first came to the attention of the investigating officers when Montero and Acosta were followed to Shades Restaurant at 983 East Fifth Avenue. Appellant is the owner of Shades. According to Ehrenborg, appellant motioned for Montero to come inside while Acosta remained in the parking lot. Ehrenborg testified that Montero stayed in Shades "for a little while" before returning to the parking lot. (Tr. at 29.) As Montero walked past a yellow Corvette in the parking lot, later identified as appellant's vehicle, he reached into the Corvette before getting back in his vehicle with Acosta.

{¶ 5} Subsequently, on June 30, 2015, undercover surveillance officers followed Montero as he stopped at the various locations "on his routes." (Tr. at 29.) Surveillance officers eventually followed Montero back to the apartment in the Easton area. After two hours, Montero left the apartment and began driving a vehicle in a direction that would take him back to Shades.

{¶ 6} Detective John Whitacre of the Columbus Division of Police testified that he was on duty as a surveillance officer when he got the call that Montero was headed back to Shades. Because he was closer to that location, Whitacre took up a position across the

street from Shades in order to surveil the restaurant parking lot.  He was in plain clothes and in an unmarked police vehicle.

{¶ 7}   Whitacre observed Montero arrive in a Honda CRV and stop the vehicle in the Shades parking lot.  Whitacre noted the time as 12:38 p.m.  According to Whitacre, Montero got out of his vehicle and opened the hood, as if he was working on the vehicle.  Montero then looked in the back of the vehicle before getting back in and waiting.  At 12:53 p.m., appellant arrived at Shades in a conversion van.  According to Whitacre, the two vehicles were parked close to one another and they were the only two vehicles in the parking lot.  Whitacre saw appellant get out of his vehicle and begin talking to Montero.  Whitacre then observed Montero and appellant simultaneously lean into the vehicle.  Though Whitacre did not see a hand-to-hand exchange, Whitacre testified that he suspected a drug transaction had occurred.

{¶ 8}   As Montero got back in his CRV and left, appellant went inside Shades for a few minutes and then got back in his vehicle.  Whitacre testified that appellant left the restaurant in his vehicle at 1:05 p.m.  Whitacre followed appellant out of the restaurant parking lot as appellant winded through several city streets.  While he followed appellant's vehicle, Whitacre communicated with the other officers in the unit about what he had observed and asked whether he should call for a traffic stop.  Whitacre testified that the other officers, including Ehrenborg, left it up to him whether to initiate a traffic stop based on what he had seen at Shades or to wait and see if appellant committed a traffic violation before calling for a marked police cruiser.[1]

{¶ 9}   Whitacre continued to follow appellant until he reached the intersection of Gladstone Avenue and 21st Avenue, where appellant attempted to make a U-turn.  According to Whitacre, because of the wide turning radius of the van, appellant was not able to complete the U-turn and he was forced to stop at the curb and back up.  From there, appellant pulled forward and parked the van.  Whitacre called for a nearby patrol vehicle to stop appellant's vehicle for an illegal U-turn.  The trial court found that

---

[1] Whitaker stated that the investigative team prefers not to stop a suspect's vehicle based solely on suspicion of drug activity, even if they believe they have probable cause to do so, because they do not wish to alert suspects to their undercover operations.

Whitacre "was credible" when he testified that he witnessed appellant's vehicle make an illegal U-turn. (Tr. at 218.)

{¶ 10} Officer Kerry Cibulskas, a 17-year veteran of the Columbus Division of Police, testified that he was operating his marked police cruiser in the area when he received a call from "an undercover" informing him that he had observed appellant's vehicle make an illegal U-turn on Gladstone and requested a traffic stop. (Tr. at 161.) Within minutes, Cibulskas pulled his cruiser behind appellant's vehicle, with overhead lights flashing. Cibulskas testified that the video recorder in his cruiser is always on but that it begins to record when he activates overhead lights, with a one minute look back. The clock on the video recorder indicated that the stop occurred at 13:06:56 p.m. or 1:06 and 56 seconds.[2]

{¶ 11} According to Cibulskas, as he approached appellant's vehicle on foot, appellant began to walk away from the vehicle. When Cibulskas made contact with appellant, appellant already had his license out. Because the undercover had not explained to Cibulskas why he wanted appellant stopped, other than the illegal U-turn and because Cibulskas detected a slight odor of marijuana about appellant's person, Cibulskas decided to place appellant in the back seat of his cruiser. When he got appellant in the cruiser he began making the customary record inquiries including verifying appellant's identity, checking appellant's license and vehicle registration, and checking for possible warrants. Cibulskas testified that a typical traffic stop for a minor traffic offense "could take me 15 to 20 minutes." (Tr. at 165.)

{¶ 12} According to Cibulskas, while he was writing a ticket for an illegal U-turn, several individuals from the neighborhood began milling around his police cruiser attempting to speak with appellant. Cibulskas stated that appellant was yelling for someone by the name of Hassan and attempting to have Hassan make a telephone call for him. According to Cibulskas, because there were five or six individuals outside the cruiser causing a commotion, another officer who had arrived at the scene, Mark Dillelo, handled the crowd as Cibulskas wrote the ticket.

---

[2] The prosecutor played the video for Cibulskas as he testified and it was marked as State's Exhibit 9, but neither party moved the trial court to admit the exhibit into evidence.

{¶ 13} At some point, Cibulskas asked appellant for consent to search his vehicle, but appellant refused. Cibulskas also called Whitacre to obtain more information regarding the reason Whitacre had requested the traffic stop. When Cibulskas asked Whitacre how he should proceed, Whitacre told him to wait for a K-9 unit. Whitacre testified that he told Cibulskas he suspected there were illegal narcotics in appellant's vehicle. The evidence in the record shows that Officer John Dollmatsch of the K-9 unit received the call to report to the scene at 1:20 p.m., approximately 13 minutes after Cibulskas initiated the traffic stop.

{¶ 14} The K-9 unit arrived at the scene at 1:32 p.m. and began a sweep of appellant's vehicle. Dollmatsch testified that he has worked in the Columbus Division of Police for 26 years, the last 11 of which were with the K-9 unit. The prosecutor played the cruiser video for Dollmatsch as he testified. While viewing the video, Dollmatsch was able to identify the point in time when his dog alerted to the presence of narcotics in appellant's vehicle. According to Dollmatsch, the time was 13:33:40 p.m. or 1:33 and 40 seconds. A subsequent search of appellant's vehicle by Dollmatsch and Dilello uncovered a large quantity of heroin wrapped in plastic and a paper towel and covered in electrical tape. The heroin was located in a pocket behind the front passenger's seat, the same area where the dog had alerted. The U-10, entitled "Arrest Information," completed by Cibulskas indicates that the initial weight of the heroin recovered from appellant's vehicle was "250 grams." (Def's. Ex. B, State's Ex. 5.)[3]

{¶ 15} At the close of the evidence, the trial court announced its ruling denying appellant's motion to suppress. Appellant subsequently pleaded no contest to the charges in the indictment. The trial court convicted appellant of possession of heroin and trafficking in heroin and sentenced appellant to three years in prison, a mandatory fine of $10,000, and five years of post-release control. Appellant appealed to this court from the trial court judgment.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Appellant sets forth the following two assignments of error:

---

[3] The U-10 is marked both as Defendant's Exhibit B and State's Exhibit 5. The record shows that several witnesses identified and referenced the U-10 during their testimony, but Defendant's Exhibit B was the only exhibit admitted into evidence.

[1.] The trial court erred allowing law enforcement officer to testify about Appellant's traffic stop because the officers lacked legal competency.

[2.] The trial court erred in denying Appellant's Motion to Suppress because law enforcement officers unreasonably expanded the duration and scope of the traffic stop.

## III. STANDARD OF REVIEW

{¶ 17} "The review of a motion to suppress is a mixed question of law and fact." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 32, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372. "The very nature of the questions presented requires a case-by-case fact-driven analysis." *Id.*, citing *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, ¶ 14. "When considering a motion to suppress, the trial court assumes the role of fact finder and, accordingly, is in the best position to resolve factual questions and evaluate witness credibility." *Columbus v. Body*, 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "As such, an appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence." *Body* at ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the reviewing court must then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard." *Body* at ¶ 9, citing *Burnside* at ¶ 8, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

## IV. LEGAL ANALYSIS

### A. First Assignment of Error

{¶ 18} In his first assignment of error, appellant contends that Whitacre was not competent to give testimony regarding the traffic stop at issue because he was "not in uniform and not operating a lawfully-marked patrol cruiser." (Appellant's Brief at 5.) We disagree.

{¶ 19} We will not reverse a trial court's decision regarding witness competency absent an abuse of discretion. *State v. Ferguson*, 10th Dist. No. 07AP-999, 2008-Ohio-6677, ¶ 24, citing *State v. Clark*, 71 Ohio St.3d 466, 469 (1994). An abuse of discretion connotes more than an error of law or judgment; it implies a decision that is

unreasonable, arbitrary, or unconscionable. *Ferguson* at 24, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Evid.R. 601 provides in relevant part:

> Every person is competent to be a witness except:
>
> * * *
>
> (C) An officer, *while on duty for the exclusive or main purpose of enforcing traffic laws*, arresting or assisting in the arrest of a person charged with a traffic violation punishable as a misdemeanor where the officer at the time of the arrest was not using a properly marked motor vehicle as defined by statute or was not wearing a legally distinctive uniform as defined by statute.

(Emphasis added.)

{¶ 20} A number of statutory provisions provide similar requirements, such as R.C. 4549.13:

> Any motor vehicle used by a * * * peace officer, while said officer is *on duty for the exclusive or main purpose of enforcing the motor vehicle or traffic laws of this state*, provided the offense is punishable as a misdemeanor, shall be marked in some distinctive manner or color and shall be equipped with * * * at least one flashing, oscillating, or rotating colored light mounted outside on top of the vehicle.

(Emphasis added.)

{¶ 21} The consequences of violating R.C. 4549.13 are explained in R.C. 4549.14 as follows:

> Any officer arresting, or participating or assisting in the arrest of, a person charged with violating the motor vehicle or traffic laws of this state, provided the offense is punishable as a misdemeanor, such officer *being on duty exclusively or for the main purpose of enforcing such laws*, is incompetent to testify as a witness in any prosecution against such arrested person if such officer at the time of the arrest was using a motor vehicle not marked in accordance with section 4549.13 of the Revised Code.

(Emphasis added.)

{¶ 22} The Supreme Court of Ohio has interpreted the phrase " 'on duty exclusively or for the main purpose of enforcing [motor vehicle or traffic] laws' in R.C. 4549.14 and similar language in Evid.R. 601(C) to refer to the officer's main purpose for his whole period of duty and not to his duty during the apprehension and arrest of the suspect." *State v. Huth*, 24 Ohio St.3d 114, 116 (1986), quoting *Columbus v. Stump*, 41 Ohio App.2d 81, 85 (10th Dist.1974). The trial court overruled appellant's Evid.R. 601(C) objection citing Whitacre's testimony that he was a narcotics officer on June 30, 2015 and that his primary duty on that day was surveillance of suspects identified in the ongoing investigation of a heroin trafficking ring. The trial court found that Whitacre was not "on duty for the main or exclusive purpose of enforcing traffic laws." (Tr. at 85.) The record supports the trial court's conclusion. Accordingly, the trial court did not abuse its discretion when it overruled appellant's Evid.R. 601(C) objection to Whitacre's testimony.

{¶ 23} Appellant next contends that the trial court erred by permitting Cibulskas to testify regarding the illegal U-turn precipitating the traffic stop at issue because Cibulskas did not see appellant make an illegal U-turn and, therefore, did not have personal knowledge of the offense. We note that appellant did not interpose an objection to Cibulskas's testimony. Consequently, appellant has waived all but plain error with respect to the admission of Cibulskas's testimony. *State v. S.M.*, 10th Dist. No. 14AP-701, 2015-Ohio-1916, ¶ 22.

{¶ 24} In *State v. Muldrow*, 10th Dist. No. 15AP-1119, 2016-Ohio-4774, this court adopted the "collective knowledge doctrine," whereby "knowledge of law enforcement officers is imputed to other officers." *Id.* at ¶ 18. Under *Muldrow*, where an officer making an investigative stop relies solely on information provided in a dispatch, a *Terry*[4] stop is constitutionally valid provided the state demonstrates at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity. *Muldrow* at ¶ 21.

{¶ 25} Here, the evidence demonstrates that Whitacre had personal knowledge appellant made the illegal U-turn and that Whitacre communicated that information, along with a description of the vehicle, to Cibulskas, who made the traffic stop within

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

minutes of receiving the information. Under the collective knowledge doctrine, Cibulskas was competent to testify regarding the U-turn violation precipitating the traffic stop, even though he did not personally observe the violation. *See State v. Johnson*, 10th Dist. No. 16AP-689, 2017-Ohio-5527, ¶ 23-24 (because the undercover narcotics officer personally observed the front license plate violation and because that information was communicated to the arresting officer before he made the traffic stop, the arresting officer was competent to testify at the suppression hearing regarding the facts justifying the traffic stop). Accordingly, appellant has failed to establish any trial court error with regard to the admission of Cibulskas's testimony, let alone plain error.

{¶ 26} For the foregoing reasons, appellant's first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 27} In appellant's second assignment of error, he argues that the trial court erred when it denied his motion to suppress the evidence uncovered in the warrantless search of his vehicle. More specifically, appellant contends that the police unreasonably extended the duration of the traffic stop beyond the time required to complete the task of citing appellant for an illegal U-turn. According to appellant, the totality of the circumstances surrounding this traffic stop require exclusion of the evidence uncovered in the warrantless search of his vehicle under the United States Supreme Court decision in *Rodriguez v. United States*, ____ U.S. ____, 135 S.Ct. 1609, 1615 (2015). We disagree.

{¶ 28} In *Rodriguez*, the Supreme Court acknowledged that the Fourth Amendment does not prohibit certain unrelated investigative activities during the course of a traffic stop, such as the use of a K-9 unit, so long as they do not extend the duration of the detention. *Id*. at 1611, citing *Illinois v. Caballes*, 543 U.S. 405, 406 (2005). The Supreme Court recognized, however, that "a traffic stop 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez* at 1611, quoting *Caballes* at 407. "[T]the critical question * * * is not whether the dog sniff occurs before or after the officer issues a ticket, * * * but whether conducting the sniff * * * adds time to the stop." (Citations omitted.) *Rodriguez* at 1616. The majority in *Rodriguez* concluded that because the officer had completed the purpose of the traffic stop when he issued the written warning, the Fourth Amendment

prohibited further detention for the dog sniff unless the officer had a reasonable suspicion that the occupants had been involved in other illegal activity. *Id.*

{¶ 29} The Supreme Court made clear in *Rodriguez* that, absent "the reasonable suspicion ordinarily demanded to justify detaining an individual," a police officer may not prolong a traffic stop to conduct a K-9 sniff beyond the time necessary to handle the traffic violation that justified the stop. *Id.* at 1615. The court acknowledged, however, the reasonable suspicion may develop during the course of an ordinary traffic stop so as to justify extending the seizure beyond the time needed to accomplish its original purpose. *Id.* at 1616-17.

{¶ 30} In this instance, Cibulskas made the initial traffic stop based on information provided to him by Whitacre. Cibulskas testified that a typical traffic stop for an illegal U-turn would take 15 to 20 minutes to complete. When Cibulskas first made contact with appellant, he detected a slight odor of marijuana about appellant's person. Though Cibulskas did not search appellant's vehicle at that time, he did place appellant in the back seat of his cruiser so that he could contact Whitacre regarding the circumstances surrounding the requested traffic stop. The evidence shows that five or six individuals were milling around outside the cruiser and that one of these individuals approached the cruiser attempting to speak with appellant. One of Cibulskas's fellow officers was required to deal with an individual who was "running his mouth." (Tr. at 220.) The trial court found that this added time to the traffic stop. Cibulskas's testimony supports the trial court's finding.

{¶ 31} The evidence also shows that, within 13 minutes of the initial stop, Cibulskas or his fellow officer called for a K-9 unit. At or about that time, Cibulskas called Whitacre and the two exchanged information. Cibulskas told Whitacre he had detected a slight odor of marijuana about appellant's person, and Whitacre told Cibulskas that he suspected appellant's vehicle contained heroin. Whitacre then instructed Cibulskas to wait for the K-9 unit to confirm his suspicion. The K-9 unit arrived at 1:30 p.m. and began a sweep of appellant's vehicle at 1:32 p.m. The trial court, after viewing the cruiser video, determined that the dog alerted less than two minutes later.

{¶ 32} In announcing its ruling on the motion to suppress, the trial court made the following observations and findings:

> This is a close case, in my mind, because it's about 26, 27 minutes. But you don't have just the traffic ticket. You do have the other information from the detectives regarding a known heroin dealer, the observations that they make, the observations they had made during the course of their investigation. And, in my mind, that doesn't justify a search of the vehicle, but it would justify detaining you a little bit longer for the dog to get there.
>
> * * *
>
> So given the totality of the circumstances, the observations of the detectives, the photographs, the known heroin dealer, I believe that even if it went beyond the 20 minutes or what I might consider reasonable, 25 minutes, that there was reasonable suspicion to have the dog come to the scene anyway.

(Tr. at 220-21, 224.)

{¶ 33} Our reading of the trial court's ruling discloses that the trial court did not believe that the information Whitacre had gathered regarding the suspected drug transaction would have, standing alone, provided probable cause to stop appellant's vehicle and search for illegal narcotics but that such information did give rise to a reasonable suspicion that appellant's lawfully stopped vehicle contained narcotics. The trial court expressly recognized that pursuant to *Rodriguez*, police may extend the duration of a lawful traffic stop in order to bring in a K-9 unit where the totality of the circumstances gives rise to a reasonable suspicion of other criminal activity. In this case, the evidence shows that some time after Cibulskas began writing the traffic ticket, he contacted Whitacre and the two discussed what they had observed. Cibulskas discussed the relevant sequence of events as follows:

> Q. You weren't basing any search based on the marijuana, to be fair, right?
>
> A. The search, basically, the smell of the marijuana, was including the totality of why I was going to detain him and put him back in the car because of the investigation of what the detective had said. At that point, we were going to contact the detective to see where he wanted to continue this.

Q. If you tell it this way, absent the dog alerting, you weren't going to search his vehicle, were you?

A. Again, I was waiting for direction of the detective of where he wanted the incident to go.

THE COURT: You weren't going to make the independent decision to search the vehicle?

THE WITNESS: No, sir. I didn't know what the vehicle was involved in, what this investigation was involved in. I was waiting for the direction of the other detective.

Q. (By Mr. Landusky) All of this was at the direction of another officer, not you?

A. Yes, sir.

Q. The entire stop, the decision to search, was based on a decision by the other officer when you told him that the dog had alerted?

A. At that point, it was prior to the dog arriving is when we spoke with him on the phone.

Q. You say prior to the dog arriving, you were going to search with or without the dog?

A. No. We contacted the detective and said, "Here's where we are." He said, "We'll go ahead. You guys have a dog coming to check the car. Just wait for the dog to come."

(Tr. at 183-85.)

{¶ 34} In ruling on the motion to suppress, the trial court recognized that the reasonable suspicion standard is less demanding than probable cause. In discussing the *Rodriguez* case, the trial court stated:

What the Supreme Court did [in *Rodriguez*] is, they said, "No, you cannot extend a traffic stop unless there's other reasonable suspicion of criminal activity, justified in detaining Rodriguez beyond completion of the traffic infraction investigation." They remanded it to the Eighth Circuit to consider that.

> In other words, you would have to have probable cause to search the vehicle. To detain a person for a traffic stop, which is what happened here, you would have to see a violation, or you would have to have reasonable suspicion of criminal activity, not probable cause. That's a lower standard.

(Tr. at 215-16.)

{¶ 35} Here, the trial court heard witness testimony regarding the ongoing investigation of a heroin trafficking ring, Whitacre's surveillance of appellant as he briefly met with a known drug dealer under circumstances which caused him to believe that a drug transaction had occurred, and the slight odor of marijuana Cibulskas detected on appellant's person as appellant walked away from his vehicle. Thus, the evidence in the record supports the trial court's conclusion that based on the totality of the circumstances, information known to Cibulskas and Whitacre gave rise to a reasonable suspicion that appellant's vehicle contained illegal drugs. *See, e.g.*, *State v. Brooks*, 9th Dist. No. 28070, 2016-Ohio-7025 (officer's observation of multiple air fresheners in the car coupled with his personal knowledge that defendant was suspected of trafficking in drugs was sufficient to provide him with reasonable suspicion that defendant was involved in criminal activity beyond that which prompted the initial traffic stop, justifying further detention to conduct a dog sniff of the vehicle); *State v. Bennett*, 8th Dist. No. 86962, 2006-Ohio-4274, ¶ 25-26 (officers' observation of an air freshener on the front vent of the defendant's vehicle, along with the officers' knowledge that the defendant had recently been questioned by the DEA, among other facts, was sufficient to give officers reasonable suspicion of criminal activity such that the officers were justified in briefly extending the duration of the traffic stop to conduct a dog sniff of the defendant's vehicle); *State v. Stevens*, 4th Dist. No. 15CA30, 2016-Ohio-5017, ¶ 28 (the appellant's extreme nervousness, a dispatch informing the officer that the appellant had a prior drug conviction, a slight odor of marijuana overpowered by very strong air freshener, and excessive window tint provided a reasonable suspicion to prolong the initial traffic stop in order to bring in a K-9 unit); *State v. Balanik*, 11th Dist No. 2015-L-112, 2016-Ohio-3511 (nervousness of the occupants of the car, inconsistent statements as to where the occupants were going that night, and the presence of a blood-stained napkin, which was specifically indicative of intravenous drug use, justified prolonged detention of defendant to bring in canine unit); *State v.*

*Gibson*, 3d Dist. No. 1-15-22, 2015-Ohio-3812 (a reasonable suspicion of drug activity justifying the extension of the traffic stop for a narcotics dog existed where the experienced officer made the stop of defendant's vehicle on a stretch of the interstate known to be used by drug couriers, defendant appeared nervous, and defendant gave inconsistent answers to the officer's questions regarding his inability to produce a license, where he attended school, and the occupation of his "girlfriend" who allegedly rented the vehicle). Because a reasonable suspicion of other illegal activity arose during the initial traffic stop, it was constitutionally reasonable to extend appellant's detention beyond the time it would normally take to conduct a traffic stop for an illegal U-turn in order for the K-9 unit to conduct a sweep. Consequently, the fact that the drug sniffing dog did not alert to the presence of narcotics until 26 or 27 minutes after Cibulskas initiated the traffic stop does not invalidate the search on constitutional grounds.

{¶ 36} Consistent with *Rodriguez*, "[a]n officer may expand the scope of the stop and may continue to detain the vehicle without running afoul of the Fourth Amendment if the officer discovers further facts which give rise to a reasonable suspicion that additional criminal activity is afoot." *State v. Rose*, 4th Dist. No. 06CA5, 2006-Ohio-5292, ¶ 17, citing *State v. Robinette*, 80 Ohio St.3d 234, 240 (1997). "[W]hen an appellate court reviews a police officer's reasonable suspicion determination, 'the court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers.' " *Stevens* at ¶ 19, quoting *State v. Ulmer*, 4th Dist. No. 09CA3283, 2010-Ohio-695, ¶ 23, citing *United States v. Cortez*, 449 U.S. 411, 418 (1981).

{¶ 37} In this case, the trial court, after weighing the evidence presented at the suppression hearing and assessing witness credibility, determined that the collective knowledge of Whitacre and Cibulskas gave rise to a reasonable suspicion that appellant's vehicle contained evidence of illegal narcotics. The trial court concluded that the officers' reasonable suspicion justified the continued detention of appellant for the purpose of permitting a K-9 unit to conduct an investigative sweep. Once the dog alerted to the presence of narcotics, Whitacre and Cibulskas had probable cause to conduct the search of appellant's vehicle which led to the discovery of heroin. *State v. Phillips*, 10th Dist. No. 14AP-79, 2014-Ohio-5162, ¶ 21.

{¶ 38} For the foregoing reasons, we hold that the trial court did not err when it denied appellant's motion to suppress the evidence of heroin found in his vehicle. Appellant's second assignment of error is overruled.

## V. CONCLUSION

{¶ 39} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK, P.J., and BRUNNER, J., concur.

_____