[Cite as *State v. Mee*, 2017-Ohio-7343.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 27429 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1105 |
| | : | |
| MATTHEW I. MEE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellee* | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 25th day of August, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ALICE B. PETERS, Atty. Reg. No. 0093945, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellant

MARK E. LANDERS, Atty. Reg. No. 0026042, 2071 Aspen Ridge, Dayton, Ohio 45459
     Attorney for Defendant-Appellee

. . . . . . . . . . . . .

TUCKER, J.

**{¶ 1}** Plaintiff-appellant, the State of Ohio, appeals from the trial court's decision of January 26, 2017 sustaining in part and overruling in part a motion to suppress filed by Defendant-appellee, Matthew I. Mee. The State argues that the trial court erred by sustaining Mee's motion in part with respect to evidence obtained as the result of a search of Mee's vehicle during a traffic stop. In its decision, the trial court determined that the search was unlawful because Mee was detained for a longer interval than was reasonably necessary. We find that Mee's detention did not last longer than was reasonably necessary, and we therefore reverse.

## I. Facts and Procedural History

**{¶ 2}** On April 4, 2016, Officer Spinks of the Kettering Police Department, on routine patrol in a marked cruiser, witnessed a traffic violation "on Research Boulevard just east of Founders Drive." Tr. of Hr'g on Mot. to Suppress 6, 8-9 and 23 [hereinafter *Tr. of Hr'g*]. Specifically, he saw a vehicle being driven by Mee "in the left through lane * * * drift[]* * * into the right lane and then [return to] the left * * * lane," crossing the dividing line between the two lanes in the process, and violating § 432.08 of the Kettering Codified Ordinances [hereinafter *KCO*].[1] *Id.* at 9, 19 and 30. Officer Spinks stopped the vehicle shortly afterwards at approximately 1:59 a.m., near the intersection of Shakertown Road and County Line Road. *See id.* at 10 and 53.

**{¶ 3}** With Mee's vehicle stopped, Officer Spinks "called out to dispatch, [reporting]

---

[1] Under KCO 432.08(a), "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic," a vehicle "shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." *See also* R.C. 4511.33(A)(1).

the registration [number of] the vehicle and [the] location" of the stop. *Id.* at 10. He approached the vehicle from the driver's side, identified himself to Mee and the two passengers with Mee, and explained that he made the stop as the result of Mee's "failure to maintain a continuous lane." *Id.* at 10 and 13. After obtaining Mee's proof of insurance and driver's license, and identification from the two passengers, Officer Spinks asked Mee "where he was coming from" and whether he had "consumed any alcohol," because, based on past observations of other drivers "drifting the way that he did," Officer Spinks suspected that Mee might have been intoxicated. *Id.* Mee denied that he had consumed any alcohol, and Officer Spinks "didn't smell any alcohol in the car[,] which kind of assured that that wasn't the case." *Id.* at 10-11. In response to a follow-up question from Officer Spinks, Mee and his two passengers also denied that "there were any drugs in the vehicle." *Id.* at 11.

{¶ 4} Officer Spinks returned to his cruiser to run background checks "through LEADS [the Law Enforcement Automated Data System,] NCIC [the National Crime Information Center] and JusticeWeb." *Id.* at 11-12. This revealed that a drug-related driver's license suspension had been imposed on one of Mee's passengers ("Passenger One") in 2014. *See id.* at 13. While Officer Spinks was running background checks, a second officer with the Kettering Police Department, Officer Maloney, and his K-9 partner, Jax, responded to the stop to provide backup for Officer Spinks.[2] *Id.* at 13, 34, 62-65,

---

[2] Officer Spinks testified that Officer Maloney arrived with the background checks already in progress. Tr. of Hr'g 13 and 34. Mee and one of the passengers testified that Officer Maloney arrived as, or shortly after, Officer Spinks returned to his cruiser, which generally fits with Officer Spinks's testimony. *Id.* at 130-131 and 143-144. Officer Maloney testified that he arrived while "Officer Spinks was talking to the occupants of [Mee's] vehicle" and that he "began to exit [his] patrol car about the same time that Officer Spinks" finished speaking with them. *See id.* at 65.

130-131 and 143-144. Officer Spinks estimated that Officer Maloney arrived at approximately 2:03 or 2:04 a.m.; similarly, Officer Maloney estimated that he arrived within one to three minutes after Officer Spinks stopped Mee's vehicle. *Id.* at 53 and 87.

{¶ 5} In light of the results of the background checks, and at least partly prompted by Officer Maloney's arrival, Officer Spinks decided to ask for consent to search Mee's vehicle or, in the event that Mee did not consent, to have Officer Maloney and Jax conduct a free-air sniff. *See id.* at 14 and 53. Officer Spinks, now accompanied by Officer Maloney, returned to Mee's vehicle, again asked Mee and his passengers whether "they had any drugs or anything illegal in the vehicle," and requested Mee's consent to a search. *Id.* at 14 and 65-66. Mee declined, indicating that he wanted to go home.[3] *Id.* at 14 and 66. Along with one of his passengers ("Passenger Two"), Mee testified that Officer Spinks had spent roughly five to ten minutes in his cruiser before he and Officer Maloney returned to ask for consent.[4] *Id.* at 131 and 144.

{¶ 6} At that point, Officer Spinks informed Mee that he intended to have Officer Maloney and Jax conduct a free-air sniff and that, in accord with departmental policy, he would require Mee and the two passengers to exit Mee's vehicle for that purpose.[5] *Id.*

---

[3] Mee stated that Officer Spinks asked him three times for consent to search his vehicle, though his testimony includes specific references to only two such requests. Tr. of Hr'g 143 and 145-147.

[4] Passenger One, the passenger who had a drug-related driver's license suspension in 2014, did not testify at the hearing on Mee's motion to suppress. *See* Tr. of Hr'g 13 and 133. Officer Spinks was not asked how long he took to complete the background checks. Though Officer Maloney did not recall how long the background checks took, he indicated that "that process [usually] takes several minutes." *Id.* at 87.

[5] Officer Maloney testified that he, rather than Officer Spinks, might have asked Mee to exit the vehicle. Tr. of Hr'g 66. Neither officer used the word "policy," but Officer

at 14-15, 50 and 67.   Officer Spinks had Mee exit first and requested permission to pat him down for weapons; Mee consented.[6]   *Id.* at 15 and 67.   Approximately 12 to 15 minutes had passed since Officer Spinks initiated the stop.   *Id.* at 15, 67 and 148.

{¶ 7} In Mee's "left side jacket pocket, [Officer Spinks] felt a bottle" and "hear[d] a bag," so he asked Mee if he "could put [his] hands into [Mee's] pocket" to retrieve the items.   *Id.* at 15 and 67.   Mee again consented.[7]   *Id.* at 57-58.   The contents of Mee's pocket proved to be "a pill bottle and a bag that contained a bunch of pills."   *Id.* at 15. Mee told Officer Spinks that the pills were pain medication, but when Officer Spinks "looked at the bottle and compared what the bottle said to what the pills looked like, they weren't the same."[8]   *Id.*   This prompted Officer Spinks to place Mee in handcuffs and take him into investigative detention.   *Id.*

{¶ 8} Officer Spinks and Officer Maloney next asked Passenger Two to exit Mee's vehicle.   *Id.* at 17 and 69.   As Passenger Two emerged from the vehicle, Officer Spinks saw what looked like two "Rice Krispie treats and a brownie" on the floorboard in front of Passenger Two's seat, and when the officers asked what the items were, Passenger Two

---

Maloney stated that he was "trained not" to allow occupants to remain in a vehicle during a free-air sniff.   *Id.* at 14-15, 50, 54-55 and 67.   Officer Spinks testified that removing the occupants of a vehicle during a free-air sniff is "protocol" for "their safety, because of the dog, and so that they can't interfere."   *Id.* at 50.

[6] Mee denies that Officer Spinks requested permission to conduct the pat-down.   Tr. of Hr'g at 149.

[7] Mee denies that he consented.   Tr. of Hr'g at 149.

[8] Officer Maloney, and Mee himself, testified that Mee told Officer Spinks that the pills were Xanax, a prescription medication for the treatment of anxiety disorders.   Tr. of Hr'g at 68 and 149; United States Food & Drug Administration, *Medication Guides—Xanax*, https:wwwaccessdatafdagovdrugsatfda_docs/label/2016/018276s052lbl.pdf#page=24 (accessed June 27, 2017).

indicated that they were "treats that had been baked with marijuana and * * * had been given to him by Mr. Mee."[9]   *Id.*   Believing that they had probable cause, the officers then undertook a complete search of Mee's vehicle without the assistance of Jax.   *See id.* at 17-18 and 69-70.

{¶ 9} Officers Spinks and Maloney eventually discovered felony-level drugs contained in a lockbox, which they found inside a bookbag belonging to Mee.   *Id.* at 17-18, 72.   Officer Maloney then informed Mee of his Miranda rights.   *Id.* at 72.   The officers never conducted a free-air sniff, and Officer Spinks only later completed a written traffic citation—once they "got back to the police department."   *Id.* at 49.

## II. Analysis

{¶ 10} For its sole assignment of error, the State contends that:

THE TRIAL COURT ERRED IN SUSTAINING MEE'S MOTION TO SUPPRESS BECAUSE OFFICER SPINKS DID NOT PROLONG THE TRAFFIC STOP BEYOND THE TIME REASONABLY REQUIRED TO COMPLETE HIS INVESTIGATION OF THE TRAFFIC VIOLATION AND ISSUE A CITATION.

{¶ 11} An appellant has three methods for challenging a trial court's ruling on a motion to suppress: (1) contesting the court's findings of fact; (2) asserting that the court evaluated the facts pursuant to the wrong test; and (3) arguing that the court drew the wrong legal conclusion from the facts.   *See In re Long*, 5th Dist. Stark No. 2004-CA-00377, 2005-Ohio-3825, ¶ 3.   A challenge of the last variety, which the State brings in the instant matter, requires that an appellate court "independently determine, without

---

[9] Passenger Two denies that he made these statements.

deference to the trial court's conclusion, whether the facts meet the [applicable] legal standard." *Id.*, citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994), *State v. Claytor*, 85 Ohio App.3d 623, 627, 620 N.E.2d 906 (4th Dist.1993), and *State v. Guysinger*, 86 Ohio App.3d 592, 621 N.E.2d 726 (4th Dist.1993); *see* Appellant's Br. 5.

{¶ 12} The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Warrantless searches and seizures violate this prohibition unless conducted pursuant to one of the "few specifically established and well-delineated exceptions." (Citations omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One of these exceptions "is commonly known as an investigative or *Terry* stop," which includes the temporary detention of motorists for the enforcement of traffic laws. *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 17, citing *Terry*, 392 U.S. 1.

{¶ 13} Though not necessarily requiring a warrant, the temporary "detention of [persons] during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. (Citations omitted.) *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). An "automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810. Generally, a police officer's decision to stop an automobile will comport with this requirement if the officer has a "reasonable suspicion" of criminal activity. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104-1105 (9th Cir.2000); *State v. Mays*, 119 Ohio St.3d

406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23. A "seizure justified only by a police-observed traffic violation," however, " 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015), quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). After "the reasonable * * * time for issuing [a] traffic citation has [elapsed], an officer must have a reasonable articulable suspicion of illegal activity to continue the detention." *State v. Ramos*, 155 Ohio App.3d 396, 2003-Ohio-6535, 801 N.E.2d 523, ¶ 13 (2d Dist.).

{¶ 14} Nevertheless, official "conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Caballes*, 543 U.S. at 408, quoting *United States v. Jacobsen*, 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the United States Supreme Court held that the use of "a well-trained narcotics-detection dog" to examine unopened personal luggage "did not constitute a 'search' within the meaning of the Fourth Amendment" because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search," and because such an examination "discloses only the presence or absence of narcotics, a contraband item." *See also Jacobsen*, 466 U.S. at 121-123 (finding no legitimate privacy interest in the possession of contraband). Relying on its holding in *Place*, the Court found in *Caballes* that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." *Caballes*, 543 U.S. at 408.

{¶ 15} In this case, the trial court determined that "the reasonable time for the traffic

stop was concluded once Off[icer] Spinks completed running" background checks on Mee and his two passengers. Decision, Order & Entry Overruling in Part and Sustaining in Part Defendant's Motion to Suppress 9, Jan. 26, 2017 [hereinafter *Decision*]. The court made this determination consequent to its finding that Officer Spinks had no "reasonable suspicion of criminal activity other than the traffic violation that would [have] justif[ied]" the continued detention of Mee and his passengers beyond that point—that is, the completion of the background checks—because Officer Spinks "did not believe that Mee appeared nervous" during the encounter; because "Mee and his passengers denied the presence of any drugs within [Mee's] vehicle"; and because the "only occupant of the [vehicle] who had any criminal record" was Passenger One. Decision 7-8.

{¶ 16} We would concur with the trial court were the standard primarily based upon the initial purpose of the traffic stop, rather than the stop's temporal duration. In *Rodriguez*, the United States Supreme Court held that a "seizure justified only by a police-observed traffic violation" becomes " 'unlawful if it is prolonged beyond <u>the time reasonably required</u> to complete th[e] mission' " of issuing a ticket for the violation, remarking that this holding "adhere[d] to the line [it had earlier] drawn" in *Caballes*. (Emphasis added.) *Rodriguez*, 135 S.Ct. at 1612 (Ginsberg, J.), quoting *Caballes*, 543 U.S. at 407. The line drawn in *Caballes* is exactly as stated in *Rodriguez*: that a free-air search with a drug-dog "during a lawful traffic stop[] generally does not implicate legitimate privacy interests" so long as the stop "is [not] prolonged beyond the time reasonably required" to resolve the issue that initially precipitated the stop. *See Caballes*, 543 U.S. at 407-409.

{¶ 17} Justice Ginsberg, who wrote the majority opinion in *Rodriguez*, dissented

from the *Caballes* decision. Referring to the Court's seminal decision in *Terry*, the justice noted that "[i]n a *Terry*-type investigatory stop, 'the officer's action [must be] justified at its inception, and * * * reasonably related <u>in scope</u> to the circumstances which justified the interference in the first place.' " (Emphasis added.) *Caballes*, 543 U.S. at 419, quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasoning from this principle, Justice Ginsberg indicated that she "would apply *Terry*'s reasonable-relation test, * * *, to determine whether [a] canine sniff impermissibly expand[s] <u>the scope</u> of [an] initially valid seizure," adding that in her view, "it [should] hardly [be] dispositive that [a] dog sniff * * * may not * * * lengthen[] the duration of [a] stop." (Emphasis added.) *Id.* at 420-421.

{¶ 18} Yet, by adhering to the line drawn in *Caballes* when it decided *Rodriguez*, the Court implicitly, albeit not unequivocally, repudiated a primarily purpose-based or scope-based standard. For instance, Justice Ginsberg (again, writing for the majority) stated that a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," though the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining a[] [person]." *Rodriguez*, 135 S.Ct. at 1615. The justice's majority opinion later adds that "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete' " the stop. *Id.* at 1616, quoting *Caballes*, 543 U.S. at 407. Despite the Court's announced intention to adhere to the line drawn in *Caballes*, however, the foregoing remarks suggest that a traffic stop would become unlawful if an unrelated drug-dog sniff would " '<u>measurably</u> extend' " the duration of the stop, which appears to conflict with *Caballes*. (Emphasis added.) *Id.*, quoting *Arizona v. Johnson*,

555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009); *compare with Caballes*, 543 U.S. at 407-408.   In other words, the notion that a free-air search with a drug-dog may not "measurably extend" the duration of a stop justified solely by a traffic infraction appears to be at odds with the notion that such a search is permissible so long as it does not extend the stop beyond the time "reasonably required" to issue a traffic citation; ordinarily, the words "reasonable" or "reasonably" are used to refer to concepts or principles that do not readily admit of a single, inflexible definition.   *See, e.g., Payton v. New York*, 445 U.S. 573, 600, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (referring to "the word 'reasonable' " as "amorphous"); *STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 81 (2d Cir.2011) (referring to "the word 'reasonable' " as "inherently imprecise").   Justice Kennedy, in fact, wrote a dissent airing his belief that the *Rodriguez* majority opinion "cannot be reconciled with [the *Caballes*] decision * * * or a number of common police practices."   *Rodriguez*, 135 S.Ct. at 1617.

{¶ 19} In the wake of *Rodriguez*, Ohio courts have continued to apply a duration-based standard for evaluating traffic stops such as the stop at issue in this case.   *See, e.g., State v. Matheney*, 2d Dist. Montgomery No. 26876, 2016-Ohio-7690, ¶ 21-32; *State v. Neal*, 10th Dist. Franklin No. 15AP-771, 2016-Ohio-1406, ¶ 15-23; *State v. Reece*, 1st Dist. Hamilton No. C-140635, 2015-Ohio-3638, ¶ 15-25; *but see State v. Hill*, 2d Dist. Montgomery No. 26345, 2016-Ohio-3087, ¶ 10-14 (describing *Rodriguez* as "arguably prohibit[ing] [a] seizure[] resulting from inquiries unrelated to the initial purpose of a traffic stop" if the unrelated inquiries measurably extend the stop's duration).   These cases establish that to determine whether a police officer completes a traffic stop within a reasonable length of time, a court should evaluate the duration of the stop in light of the

totality of the circumstances and consider whether the officer diligently pursued the corresponding investigation. (Citations omitted.) *Matheney*, 2016-Ohio-7690, ¶ 22. Furthermore, we continue to subscribe to the principle that "a police officer need not have a reasonable suspicion that a vehicle contains contraband prior to conducting a canine sniff of the vehicle during a traffic stop ' "so long as the duration of the traffic stop is not extended beyond what is <u>reasonably necessary</u> to resolve the issue that led to the stop and [to] issue a traffic citation." ' " (Emphasis added.) *Id.* at ¶ 23, quoting *State v. Greene*, 2d Dist. Montgomery No. 25577, 2013-Ohio-4516, ¶ 22, internally quoting *State v. Kuralt*, 2d Dist. Montgomery No. 20532, 2005-Ohio-4529, ¶ 10-11.

**{¶ 20}** Here, the record demonstrates that Officer Spinks diligently pursued his traffic-related investigation and did not unreasonably prolong the period of Mee's detention. He had a brief initial discussion with Mee and immediately returned to his cruiser to run background checks on Mee and the two passengers in Mee's vehicle. Tr. of Hr'g 141-143. At approximately the same time, Officer Maloney arrived to provide backup. Officer Spinks had not requested a K-9 unit, meaning that he did not keep Mee waiting for a K-9 unit to arrive. *Id.* at 64-65.

**{¶ 21}** After running background checks, Officer Spinks decided to ask Mee for permission to search his vehicle, or in the alternative, to have Officer Maloney and Jax conduct a free-air sniff, which would not have implicated the Fourth Amendment. He did not delay after completing the background checks, but instead promptly returned to Mee's vehicle and requested consent for a search. Mee had been detained between five and ten minutes by that time. Tr. of Hr'g 130-131 and 143-144. Upon Mee's refusal to consent to a search, Officer Spinks asked him to exit his vehicle for a free-air sniff and

requested his consent to a pat-down search for weapons.

**{¶ 22}** At that point in the stop, 12 to 15 minutes had passed. *Id.* at 148. Although Officer Spinks had not yet prepared a written traffic citation, the record strongly supports the conclusion that the stop would have taken essentially the same amount of time had Officer Spinks simply begun writing a ticket immediately after he finished the background checks on Mee and the two passengers. In other words, at the time Officer Spinks received Mee's consent for a pat-down, the stop had not extended beyond the time that would otherwise reasonably have been required to complete the " 'mission of issuing a ticket for the [traffic] violation.' " *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 1612, 191 L.Ed.2d 492 (2015), quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).

**{¶ 23}** Once Officer Spinks discovered the pill bottle and the plastic bag containing pills in Mee's pocket, he and Officer Maloney acquired reasonable suspicion such that further detention of Mee was warranted. The term "reasonable suspicion" is " 'vaguely defined as something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *State v. Shepherd*, 122 Ohio App.3d 358, 364, 701 N.E.2d 778 (2d Dist.1997), quoting *State v. Osborne*, 2d Dist. Montgomery No. 15151, 1995 WL 737913, *4 (Dec. 13, 1995). We recognize that carrying prescription medication in a container other than a bottle bearing a pharmacist's label is not of itself illegal. *See* R.C. 3719.08-3719.09. Under the circumstances, however, the suspicions of Officers Spinks and Maloney could reasonably have been aroused by the fact that Mee was carrying not only a properly labelled bottle, but also a bag containing a "bunch of pills" that did not correspond to the label on the bottle. Tr. of

Hr'g 15. Though this certainly falls far short of the standard of probable cause, we find that it did support a reasonable suspicion of possible illegal activity. *See, e.g.,* R.C. 2925.14(A)(10) (defining "drug paraphernalia" as, among other things, "capsule[s], balloon[s], envelope[s], or container[s] for packaging small quantities of a controlled substance"); *State v. Jones*, 8th Dist. Cuyahoga No. 71178, 1997 WL 599377, *3 (Sept. 25, 1997); *State v. Boone*, 108 Ohio App.3d 233, 237-238, 670 N.E.2d 527 (1st Dist.1995) (finding that a plastic bag qualified as a "container" for purposes of R.C. 2925.14); *State v. Reece*, 3d Dist. Marion No. 9-93-34, 1994 WL 83416, *4 (Mar. 14, 1994) (referring to "expert evidence" showing that plastic bags are among "the types of items commonly used in the drug trade").

### III. Conclusion

{¶ 24} We find that Mee's detention did not last longer than was reasonably necessary under the circumstances, and therefore, we sustain the State's assignment of error. The decision of the trial court is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

FROELICH, J., dissenting.

{¶ 25} I disagree with the majority's conclusion that "the stop had not extended beyond the time that would otherwise reasonably have been required to complete" the traffic stop. I would hold that the police officer unlawfully extended the time necessary to complete the traffic stop, and I would affirm the trial court's ruling on the motion to

suppress.

{¶ 26} In *Rodriguez v. United States*, __ U.S. __, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015), a K-9 officer stopped Rodriguez for driving on the highway shoulder, a violation of Nebraska law. After checking Rodriguez's and his passenger's identification and issuing a warning to Rodriguez, the officer asked Rodriguez for permission to walk a canine around the vehicle. When Rodriguez refused, the officer detained him until a second officer arrived, and then the officer walked a canine around the vehicle. The dog altered to the presence of drugs in the vehicle. Seven or eight minutes elapsed between the issuance of the warning and when the dog alerted.

{¶ 27} The United States Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez*, 135 S.Ct. at 1612.

{¶ 28} Recently, in *State v. Hall*, 2017-Ohio-2682, __ N.E.3d __ (2d Dist.), we addressed whether the trial court had erred in suppressing drug-related evidence found through a canine sniff during a traffic stop. In *Hall*, the officer requested a canine unit while in the process of confirming Hall's identity. After confirming Hall's identity, the officer "did nothing to process the traffic stop for approximately eight minutes," even though he had all of the information that he needed to complete a citation. After the dog arrived, it alerted to the presence of drug-related contraband. The trial court suppressed the evidence. On appeal, the State argued that the sniff had occurred within the amount

of time (12-13 minutes) deemed reasonable for a traffic stop. The State thus claimed that the drug sniff did not unlawfully extend the stop. We affirmed the suppression ruling.

{¶ 29} In rejecting the State's argument in *Hall*, we stated that the United States Supreme Court "made clear in *Rodriguez* that an officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.' " *Hall* at ¶ 13, quoting *Rodriguez* at 1616. We explained:

> Notably, the *Rodriguez* majority explicitly rejected the government's argument that an officer may "incrementally" prolong a stop to perform a drug sniff provided he "is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances." [*Rodriguez*] at 1616. The Court emphasized that reasonableness "depends on what the police in fact do," and diligence is measured "by noting what the officer actually did and how he did it." *Id.* The "critical question" in each case is "whether conducting the sniff 'prolongs' — i.e., adds time to — 'the stop.' " *Id.*

*Hall* at ¶ 10.

{¶ 30} I agree with the majority that, since *Rodriguez*, Ohio courts, including this district, have employed a standard that focuses on the totality of the circumstances and whether the officer diligently pursued the traffic-related purpose of the stop.

{¶ 31} However, the majority holds that the officer lawfully asked Mee to exit his vehicle for a free-air sniff and pat down, because "the stop had not extended beyond the

time that would *otherwise reasonably have been required* to complete" the traffic stop. (Emphasis added; *see* ¶ 22.)   This does not consider that the officer's actions actually prolonged, i.e., added time to, the stop, as *Rodriguez* and *Hall* prohibit, and, instead, looks solely at whether the officer's request occurred within an objectively reasonable time for a typical traffic stop.

{¶ 32} Here, Officer Spinks lawfully stopped Mee for a marked lane violation.   He alerted dispatch as to his location and the vehicle's registration.   The officer approached the vehicle, identified himself, and explained the reason for the stop.   He asked for and received the driver's license and registration from Mee and identification from the two passengers.   Officer Spinks asked Mee where he was coming from and whether he had consumed any alcohol.   Mee answered negatively, and the officer did not smell any alcohol in the vehicle.   He next asked all the occupants whether there were any drugs in the car and again received negative responses.

{¶ 33} Officer Spinks then returned to his cruiser and ran all three occupants' and the vehicle's information through several computer databases.   The only thing that came back was that one of the passengers was "under an in-State drug suspension or he had an in-State drug suspension in 2014."   Officer Spinks testified that Kettering's K-9 officer, Officer Maloney, arrived while he (Spinks) was looking at the reports; Spinks had not requested a K-9 unit, and Maloney had come because he had been nearby.   Spinks testified that, after seeing the information about the passenger and "for the fact that Patrolman Maloney was already there, we would be able to run a sniff on the * * * car since it had only been several minutes."   (Supp.Tr. at 14.)

{¶ 34} Rather than writing a citation or warning, Spinks decided that he "was going

to ask them for consent to search the vehicle." Officer Spinks re-approached Mee's vehicle and asked if anyone "had any drugs or anything illegal in the vehicle," and in response to a negative answer from Mee, "asked him if he would consent to a search to [sic] the vehicle." When Mee said "he just wanted to go home," Officer Spinks "informed him that if he wasn't going to consent to a search, we had the K-9 officer there so we were going to conduct a free-air sniff on the car" and had all the occupants step out. (*Id.*)

{¶ 35} Officer Spinks was permitted to ask Mee whether he was carrying any illegal contraband in the vehicle. *See State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997). However, for Officer Spinks to cease processing the traffic violation and assist with the canine sniff, he was required to have a reasonable suspicion of criminal activity beyond the traffic violation that led to the stop. As stated in *Rodriguez*, "Like a *Terry* stop, the tolerable duration of police inquires in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop and to attend to related safety concerns." (Citations omitted.) *Rodriguez* at 1614.

{¶ 36} Here, the officers had no reasonable articulable suspicion that Mee or any of his passengers were engaged in criminal activity, other than Mee's having committed the traffic offense. The officer's contact with Mee raised no reasonable articulable suspicion of criminal activity. For example, it was not a high crime area, there was no odor of alcohol or drugs, the driver or passengers did not seem overly nervous, there were no furtive movements, the license plates were local and matched the vehicle, there was no attempt to flee from the stop, Mee had no warrants or prior driving or criminal record, and there was no rowdiness, hand-to-hand motions, or uncooperativeness. Officer Spinks acknowledged during his testimony that, if the dog did not alert during the

planned free-air sniff, "I have no reason to detain Mr. Mee any longer other than to write out the citation." Accordingly, in my view, Officer Spinks should not have ceased working on completing the traffic-related matter in order to conduct a dog sniff of Mee's vehicle.

{¶ 37} In fact, the dog sniff never occurred, because the officers were told by one of the passengers that the treats in the vehicle had marijuana in them, thus justifying a search of the vehicle. The majority concludes that the drugs were located in such a short amount of time that Officer Spinks would not have had time to complete the citation, even if he had diligently completed a traffic citation.

{¶ 38} I recognize that the duration of the stop and the short delay attendant to the anticipated dog sniff make this case more difficult. However, the fact that the total time involved in the stop *perhaps* would not have exceeded the "average" time for the straight-forward traffic stop this was does not negate or justify that it was unnecessarily prolonged by Officer Spinks's decision, without any reasonable and articulable suspicion, to look for drugs.

{¶ 39} In *Rodriguez* and *Robinette*, the citation/warning had been given and the officer then unlawfully extended the stop by asking for permission to search. In contrast to those cases, Officer Spinks did not begin to write out the citation; instead, he asked for permission to search the vehicle, and when that was denied, he asked the driver and passengers to step out of the car in preparation for the dog sniff. *Rodriguez* states, however, that "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, * * * but whether conducting the sniff 'prolongs' -- i.e., adds time to -- 'the stop[.]' " In this case, the officer took actions, without a reasonable suspicion of additional criminal activity, that prolonged the traffic stop; the fact that it was

prior to his issuing a citation should not be controlling.

**{¶ 40}** I do not suggest that Officer Maloney could not have conducted the dog sniff. A dog sniff is not a search within the meaning of the Fourth Amendment, and nothing prevented Officer Maloney from conducting a dog sniff while Officer Spinks completed the traffic citation.

**{¶ 41}** I would affirm the trial court's decision.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck, Jr.
Alice B. Peters
Mark E. Landers
Hon. Michael W. Krumholtz